# In the United States Court of Appeals for the Sixth Circuit

NATIONAL LABOR RELATIONS BOARD,
*Petitioner,*

WORKERS UNITED,
*Intervenor,*

*v.*

STARBUCKS CORPORATION,
*Respondent.*

*ON APPEAL FROM A FINAL DECISION AND ORDER BY THE NATIONAL LABOR RELATIONS BOARD*

**OPENING BRIEF OF RESPONDENT STARBUCKS CORPORATION**

LISA S. BLATT
  *Counsel of Record*
SARAH M. HARRIS
TYLER J. BECKER
DANA L. SCHNEIDER*
WILLIAMS & CONNOLLY LLP
  *680 Maine Avenue SW*
  *Washington, DC 20024*
  *(202) 434-5000*
  *lblatt@wc.com*

\* Admitted in Pennsylvania. Practice in the District of Columbia supervised by members of the D.C. Bar as required by D.C. App. R. 49(c)(8).

**CORPORATE DISCLOSURE STATEMENT**

Respondent Starbucks Corporation (Starbucks) is a Washington state corporation that operates over 9,000 retail locations across the United States. Starbucks has no parent corporation, no publicly held corporation owns more than 10% of Starbucks' stock, and no publicly held company has a 10% or greater ownership interest in Starbucks.

Dated: February 12, 2024

*/s/ Lisa S. Blatt*

LISA S. BLATT

# TABLE OF CONTENTS

Page

INTRODUCTION ....................................................................................1

Statement of Jurisdiction................................................................3

Statement of the Issues..................................................................4

Statement of the Case ....................................................................4

    A.    Factual Background ..........................................................4

    B.    Administrative Proceedings.............................................13

STANDARD OF REVIEW .................................................................18

SUMMARY OF ARGUMENT............................................................18

ARGUMENT ........................................................................................21

I.    The Board's Decision Violates the Substantial-Evidence
    Standard ....................................................................................21

    A.    The Board Lacked Substantial Evidence to Find that Anti-
        Union Animus Motivated Whitbeck's Termination .....................22

    B.    The Board Ignored Evidence of Starbucks' Substantial
        Business Justifications for Whitbeck's Termination ...................34

II.    The Board's Damages Remedy Is Unlawful............................35

    A.    The Board Awarded Compensatory Damages............................36

    B.    The NLRA Does Not Authorize Compensatory Damages..........38

    C.    Reading the NLRA to Permit Compensatory Damages
        Would Raise Multiple Constitutional Problems...........................44

CONCLUSION.....................................................................................511

# TABLE OF AUTHORITIES

## CASES

*A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935) ...........50

*Adair Standish Corp. v. NLRB*, 912 F.2d 854 (6th Cir. 1990) .........................18

*Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975) .......................................41

*Calcutt v. FDIC*, 598 U.S. 623 (2023) ..............................................................22

*Clock Elec., Inc. v. NLRB*, 162 F.3d 907 (6th Cir. 1998) ................................21

*Conley v. NLRB*, 520 F.3d 629 (6th Cir. 2008) ...............................................18

*Cortez Byrd Chips v. Bill Harbert Constr. Co.*, 529 U.S. 193 (2000) ...............41

*Ctr. Constr. Co. v. NLRB*, 482 F.3d 425 (6th Cir. 2007) .................................21

*Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212 (2022) ...............46

*Curtis v. Loether*, 415 U.S. 189 (1974) .............................................40, 41, 46, 47

*Dayton Newspapers, Inc. v. NLRB*, 402 F.3d 651 (6th Cir. 2005)............22, 34

*Ex parte Lennon*, 166 U.S. 548 (1897) ............................................................39

*FiveCAP, Inc. v. NLRB*, 294 F.3d 768 (6th Cir. 2002) ................................21, 23

*Fleming v. Ayers & Assocs.*, 948 F.2d 993 (6th Cir. 1991) ..............................40

*Franks v. Bowman Transp. Co.*, 424 U.S. 747 (1976) ......................................42

*Golden State Bottling Co. v. NLRB*, 414 U.S. 168 (1973) ................................40

*Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989) ....................................46

*Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002)...............38

*Gundy v. United States*, 139 S. Ct. 2116 (2019) .............................................49

*Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022),
    *cert. granted*, 143 S. Ct. 2688 (2023) .........................................................44, 45

*Kerwin v. Starbucks Corp.*, 657 F. Supp. 3d 1002 (E.D. Mich. 2023) .............14

*Mertens v. Hewitt Assocs.*, 508 U.S. 248 (1993) .........................................38, 46

*Nat'l Fed. of Indep. Bus. v. OSHA*, 595 U.S. 109 (2022) .................................49

*Nat'l Licorice Co. v. NLRB*, 309 U.S. 350 (1940) ...........................................47

*NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1 (1937) .............................47

*NLRB v. S. Md. Hosp. Ctr.*, 916 F.2d 932 (4th Cir. 1990) (per curiam) ..........24

*NLRB v. Seawin, Inc.*, 248 F.3d 551 (6th Cir. 2001) ..................................29, 33

*Oakwood Hosp. v. NLRB*, 983 F.2d 698 (6th Cir. 1993)..................................24

*Ohio Edison Co. v. NLRB*, 847 F.3d 806 (6th Cir. 2017) .............................21, 35

*Oil States Energy Servs. v. Greene's Energy Grp.*,
    138 S. Ct. 1365 (2018) ................................................................................45

*Oklahoma v. United States*, 62 F.4th 221 (6th Cir. 2023) ...............................49

*Panama Refin. Co. v. Ryan*, 293 U.S. 388 (1935) ............................................50

Page

Cases—continued:

*Phelps Dodge Corp. v. NLRB*, 313 U.S. 177 (1941) ...........................................40
*Phillips v. Butterball Farms Co.*, 531 N.W.2d 144 (Mich. 1995)......................37
*Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843 (2001)......................42
*Regal Knitwear Co. v. NLRB*, 324 U.S. 9 (1945) ...........................................40
*Salazar v. Buono*, 559 U.S. 700 (2010) ...........................................................40
*Smith v. Atlas Off-Shore Boat Serv., Inc.*,
    653 F.2d 1057 (5th Cir. Unit A Aug. 1981)........................................38
*State Farm v. Campbell*, 538 U.S. 408 (2003)..............................................37
*Stern v. Marshall*, 564 U.S. 462 (2011)..............................................45, 46
*Thryv, Inc.*, 372 NLRB No. 22, 2022 WL 17974951 (Dec. 13, 2022) .......*passim*
*Tiger Lily, LLC v. U.S. Dep't of Hous. & Urb. Dev.*,
    5 F.4th 666 (6th Cir. 2021) ...........................................................49
*TRW, Inc. v. NLRB*, 654 F.2d 307 (5th Cir. Unit A. 1981) ...............................24
*UAW-CIO v. Russell*, 356 U.S. 634 (1958) ..................................................39
*United States v. Burke*, 504 U.S. 229 (1992)..............................................42
*United States v. Erpenbeck*, 682 F.3d 472 (6th Cir. 2012) .............................44
*W.F. Bolin Co. v. NLRB*, 70 F.3d 863 (6th Cir. 1995) ....................................33
*Wright Line*, 251 NLRB 1083 (1980)..............................................14, 22, 34
*Ysleta Del Sur Pueblo v. Texas*, 142 S. Ct. 1929 (2022)....................................43

## CONSTITUTION AND STATUTES

U.S. Const.
    art. I, § 1............................................................................49
    art. III ........................................................................*passim*
    amend. VII....................................................................*passim*
Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ....................................1, 2
5 U.S.C. § 706 ...................................................................................18
29 U.S.C.
    § 187.............................................................................43
    § 1855...........................................................................43
    § 2617...........................................................................43

Constitution and Statutes—continued:

National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.* .............. *passim*
    § 160(b) ...........................................................................................3
    § 160(c) .................................................................................... *passim*
    § 160(e) ...................................................................3, 4, 18, 21
    § 160(f) .........................................................................................18
    § 160(j) .........................................................................................14
Civil Rights Act, § 706(g), 42 U.S.C. § 2000e-5.......................................40, 41, 42

## OTHER AUTHORITIES

Samuel L. Bray, *The System of Equitable Remedies*,
    63 UCLA L. Rev. 530 (2016)..................................................................39
*Hearing on S. 2926 Before the S. Comm on Educ. & Lab.*, 73d Cong.
    362 (1934) (statement of James A. Emery, Nat'l Ass'n of Mfrs.),
    *reprinted in* 1 NLRB, *Legislative History of the National Labor*
    *Relations Act, 1935* (1949) ................................................................44
NLRB, *Casehandling Manual, Part 3, Compliance Proceedings*
    § 10506.1 (Oct. 19, 2020), https://tinyurl.com/rfbwchwd ............................38
S. 2926, 73d Cong. (as introduced Mar. 1, 1934), *reprinted in* 1 NLRB,
    *Legislative History of the National Labor Relations Act, 1935*
    (1949) ...................................................................................................44
Howard Schultz, *Statement Before the Senate Committee on Health,*
    *Education, Labor, and Pensions* (Mar. 29, 2023),
    https://tinyurl.com/ydh7phk7 ...................................................................5
Starbucks, *Culture and Values* (2024), https://tinyurl.com/2trtbaam...............4
Starbucks, *Our Long-Standing Efforts to Put Our Partners First*
    (Mar. 13, 2023), https://tinyurl.com/m8yfj48d .................................................5

**STATEMENT IN SUPPORT OF ORAL ARGUMENT**

Respondent Starbucks Corporation requests oral argument pursuant to Sixth Circuit Rule 34(a). This case presents significant questions regarding whether the National Labor Relations Board's Order violates the substantial-evidence standard and whether the Board's compensatory-damages remedy exceeds the Board's statutory authority and violates the Constitution. Granting oral argument will ensure the Court has the opportunity to obtain further clarity on these issues.

## INTRODUCTION

Starbucks respects its employees' right to choose whether to organize under the National Labor Relations Act (NLRA), and takes seriously charges of unfair labor practices. But when resolving such charges, the National Labor Relations Board must abide by the rules set out in the NLRA and the Administrative Procedure Act (APA), as well as the Constitution. When the Board disregards those rules, it sacrifices accountability and fairness to employers and employees alike.

This case centers on Starbucks' termination of Hannah Whitbeck, a shift supervisor at a Michigan Starbucks. Starbucks terminated Whitbeck's employment because she left another partner alone in the store at night in violation of Starbucks' two-partner rule—an important safety and security rule meant to protect Starbucks partners and customers. Aggravating the problem, Whitbeck failed to notify her supervisors that she was leaving the other barista alone, preventing them from sending other staff or otherwise solving the staffing problem in a way that would keep the single barista safe. Instead, Whitbeck texted her store manager to complain about another partner, but neglected to mention the coverage issue.

The Board instead concluded that Starbucks fired Whitbeck for her labor organizing, her participation in Board proceedings, and the Union's filing of a now-dismissed charge on her behalf, not her rule violations. The Board then ordered Starbucks to reinstate Whitbeck and compensate her for all "direct or foreseeable pecuniary harms" she experienced.

That order is legally untenable. *First*, the Board's determination that Starbucks engaged in unfair labor practices is not backed by substantial evidence. The NLRA and the APA require the Board to weigh all evidence in context and reach a decision that reflects the record as a whole. But here, the Board sidestepped record evidence to find that anti-union animus—not Whitbeck's undisputed violation of safety and security rules—motivated her termination. The Board ignored similar evidence in rejecting Starbucks' affirmative defense that Whitbeck would have been discharged regardless, given her undisputed rule violation.

*Second*, the Board's imposition of a compensatory-damages remedy exceeds the Board's statutory authority under the NLRA. Before 2022, longstanding Board precedent recognized that the Board could award only reinstatement, backpay, and limited employment-related expenses. But in December 2022, the Board, by a 3-2 vote, pivoted to a sweeping new policy

requiring compensation of all "direct or foreseeable pecuniary harms" from unfair labor practices. *Thryv, Inc.*, 372 NLRB No. 22, 2022 WL 17974951, at *9-10 (Dec. 13, 2022).

This is one of the first cases where the Board imposed that new remedy, which the NLRA nowhere authorizes. Section 10(c) of the Act confines the Board to ordering *equitable* relief, namely ceasing unfair labor practices or taking "affirmative action," like reinstatement, "as will effectuate the policies of" the Act. 29 U.S.C. § 160(c). The Act thus excludes compensatory damages—quintessential *legal* relief. The Board's contrary view raises serious constitutional concerns under Article III and the Seventh Amendment, which prohibit agencies from adjudicating traditional private damages actions. The Board's unbounded interpretation of its remedial power also triggers concerns under the nondelegation doctrine. Given these myriad problems, this Court should at a minimum vacate the order and remand for the Board to consider appropriate penalties.

## STATEMENT OF JURISDICTION

The Board had jurisdiction over this unfair-labor-practice proceeding under 29 U.S.C. § 160(b). The Board issued its order on August 9, 2023. JA5. That order is final under Section 10(e) of the NLRA, 29 U.S.C. § 160(e). This

Court has jurisdiction over the Board's timely application for enforcement, which the Board filed on August 23, 2023, because the alleged unfair labor practices occurred within this circuit. 29 U.S.C. § 160(e).

## STATEMENT OF THE ISSUES

1. Whether substantial evidence supports the Board's conclusion that Starbucks committed unfair labor practices by firing Whitbeck in alleged retaliation for her unionization activity, notwithstanding Whitbeck's knowing violation of Starbucks' safety and security policy.

2. Whether section 10(c) of the NLRA, which authorizes "affirmative action, including reinstatement of employees with or without back pay," permits the Board to order Starbucks to pay damages for direct or foreseeable pecuniary harms.

## STATEMENT OF THE CASE

### A. Factual Background

1. Starbucks is the world's largest coffee purveyor, operating locations everywhere from Akron to Zeeland. In the United States alone, Starbucks employs some 235,000 people, whom Starbucks calls "partners" in line with Starbucks' longtime view that its people—along with its coffee—prompt customers to return. Starbucks, *Culture and Values* (2024),

https://tinyurl.com/2trtbaam; *see* Starbucks, *Our Long-Standing Efforts to Put Our Partners First* (Mar. 13, 2023), https://tinyurl.com/m8yfj48d.

To that end, Starbucks offers its partners opportunities to develop their careers, promoting many baristas to management and paying up to 100% of their college tuition. Howard Schultz, *Statement Before the Senate Committee on Health, Education, Labor, and Pensions* 2 (Mar. 29, 2023), https://tinyurl.com/ydh7phk7. Starbucks also offers industry-leading benefits, ranging from comprehensive health care and stock ownership to student loan assistance, paid sick leave, and backup child care. *Id.*

But, as Starbucks' policies in its Partner Manual detail, partners who fall below Starbucks' expectations and fail to deliver top-level customer service are let go. That Manual articulates Starbucks' policies for taking "corrective action" or terminating partners' employment. JA966. Individual managers have discretion to calibrate corrective actions "depend[ing] on the seriousness of the situation." JA966. Examples of serious misconduct warranting termination include "[v]iolation of safety and/or security rules." JA966. When partners engage in "severe" behavior, separation is appropriate "regardless of the corrective action history in their file." JA847. And "there is no

guarantee that a partner will receive a minimum number of warnings prior to separation from employment." JA966; *see* JA843, 855, 992.

2.    This case involves Starbucks' termination of partner Hannah Whitbeck, who worked at the Main and Liberty Starbucks in Ann Arbor, Michigan from April 2019 until April 2022. JA320. At all relevant times, Whitbeck was a shift supervisor—someone who functions both as a barista and also "help[s] guide the work of others and assist[s] with ordering and accounting." JA977. Every shift supervisor has the combination to the store's safe and holds keys to the front and back doors. JA231-232, 322-323, 454, 545. Regular baristas do not.

As detailed in Starbucks' termination notice, Starbucks terminated Whitbeck based on incidents on February 27, 2022 involving Whitbeck and another partner, B.G.[1] Both Whitbeck and B.G. were terminated for their actions that day. JA816, 818 (Notices of Termination). Starbucks terminated B.G. for "fail[ing] to communicate in a manner that was reflective of Starbucks['] Mission and Values"—namely, for violating the Partner Manual

---

[1] Because B.G. did not testify during agency administrative proceedings, Starbucks refers to this former partner by his initials, as the Board did in those proceedings.

by using profanity in the customer area of the store during an argument with Whitbeck. JA818; *accord* JA949.

Starbucks' termination notice for Whitbeck, in turn, detailed that she was terminated for "fail[ing] to communicate" and "fail[ing] to meet expectations" in her shift supervisor role. JA816. Specifically, she violated Starbucks' two-partner rule—a key safety and security policy requiring two partners to be in a store at all times—by abandoning one barista, Lucien Meloche, and leaving him to staff the store alone at night without keys to the store or access to the safe. Aggravating the problem, Whitbeck failed to communicate properly with her supervisors when Whitbeck knew there would be a coverage issue at the end of her shift, preventing her supervisors from sending someone else to help the abandoned barista. JA816; *accord* JA246, 260, 349, 557, 942-943, 949, 955, 958, 980.

The two-partner rule exists to protect partners from "the potential of robbery and other severe incidences." JA558. That rule is particularly important at the Main and Liberty store, where, as Whitbeck testified, partners had to work together to address customer violence that occurred "two to three times a week." JA330, 456; *accord* JA11 n.12.

Whitbeck's violation of the two-partner rule also involved aggravating circumstances. To start, the violation arose from altercations she had with B.G. on February 27. As her morning shift began, Whitbeck messaged store manager Erin Lind that multiple baristas were complaining about working with B.G. JA799. Whitbeck testified that she was upset with B.G. because she had heard that B.G. and other partners thought Whitbeck did not "do anything" at work. JA11, 347. In response, Whitbeck wrote in the store's daily records book—where partners document incidents at the store—that she "Did nothing like always :)." JA920.

When B.G. arrived for his shift, he read Whitbeck's records book entry and criticized Whitbeck for acting unprofessionally. JA374-375. As B.G. and Whitbeck argued, another barista stepped in. B.G. asked if the barista knew how much "[expletive]" Whitbeck talked about her behind her back. JA11, 375. After the fight, B.G. and Whitbeck stopped speaking for several hours. JA156.

That day, Whitbeck was scheduled to work until 7:00p.m. and B.G. and another employee were scheduled to work until 10:30p.m. JA868-869. B.G. was scheduled to take a 30-minute meal break from 6:45 to 7:15p.m. JA158. In these situations—when only two partners are working and one has a

scheduled meal break—Starbucks' Partner Resources Manual requires the partners to "remain in the store at all times," but compensates partners for their meal-break time. JA958-959.

Aware that the schedule would prevent B.G. from leaving the store during his scheduled meal break, Whitbeck suggested that B.G. take his meal break early. JA377. B.G. refused. JA378-379. At around 6:54p.m., B.G. left the store, in contravention of Whitbeck's repeated request that he return by 7:00p.m. JA379, 468. Whitbeck then immediately texted store manager Lind that B.G. had "confronted" her about her problems with him. JA389-390, 799.

B.G. did not return to the store by 7:00p.m. JA380. Nobody knew if, or when, he would come back. Nonetheless, Whitbeck clocked out at 7:04p.m., violating the two-partner rule and leaving the other partner alone without keys to the store. JA474, 812.

Whitbeck further aggravated the violation by departing without informing her supervisors that she needed "support for coverage" given B.G.'s departure. JA816. Despite texting Lind about B.G. just before 7:00p.m., Whitbeck did not tell Lind or anyone else that Whitbeck herself was leaving just one partner alone in the store. Nor did Whitbeck ask for more coverage.

She simply left the store insufficiently staffed. JA152. Whitbeck did text the lone partner later, but only to ask whether B.G. had returned. JA801.

Whitbeck later admitted that she should have alerted Lind as soon as Whitbeck knew she would be leaving one partner alone to run the store. JA471. As Lind later explained, had Whitbeck called her, Lind could have contacted a nearby store within walking distance for assistance, asked B.G. to stay in the building for a paid meal break, or had Whitbeck and the other barista leave the store and lock the doors. JA160.

3. The next day, knowing that she had violated Starbucks policies, Whitbeck submitted a written incident report. JA305, 803, 993. Lind met with Whitbeck the same day to discuss what happened. JA151. Per Starbucks policy, Lind also updated district manager Paige Schmehl. JA151, 953-954.

Because the February 27 events also involved B.G., Schmehl advised Lind to get a statement from B.G.—which Lind did—and to consult with Starbucks' primary human resources department, the Partner Relations Support Center, which Lind also did. JA162, 919, 948. Starbucks' Support Center informed Lind that others would speak to Schmehl—the next level manager—and additional individuals about the incidents involving both Whitbeck and B.G. JA164. B.G. delayed writing a statement until March 9 or

10. JA165, 919. Lind sent B.G.'s statement to Schmehl on March 11. JA170. Schmehl sent the statements to the Support Center. JA581.

The Support Center contacted Schmehl on March 16 and held a call with her on March 18. JA579-583, 995. Based on advice during that call, Schmehl within a few days spoke with the legal department about discipline for both Whitbeck and B.G., and Schmehl sought a statement from the partner whom Whitbeck had abandoned in the store, Meloche. JA583-584. As of March 21, Schmehl had recommended terminating both Whitbeck and B.G. JA579.

On April 3, the legal department approved Schmehl's recommendation to terminate Whitbeck. JA590. Schmehl asked Lind, who had by now switched store locations, to support the new store manager at Main and Liberty in relaying the termination. JA196, 930. Lind and the new manager exchanged texts starting on April 5 to coordinate schedules, and ultimately gave Whitbeck the Notice of Separation on April 11. JA202, 816, 926-929. B.G. was terminated three days later, on April 14. JA818.

4. The Board instead attributes Whitbeck's termination to her labor organizing, participation in Board proceedings, and the Union's filing of a since-dismissed unfair-labor-practice charge on her behalf. In late January 2022, a union organizer contacted Whitbeck and a coworker about unionizing

their store, and gave them contact information for Workers United. JA343-345. Whitbeck thereafter encouraged coworkers to unionize the Main and Liberty store. JA343-344.

On February 4, 2022, Whitbeck and other partners at their store notified Starbucks of their intent to unionize. JA789. A local radio station also interviewed Whitbeck about the effort. JA359, 363. The same day, Whitbeck and some other partners began wearing union buttons to work. JA352, 658. On February 8, the Union then filed a petition for an election at the store. JA741.

On February 25, Whitbeck asked Lind to find others to cover her shifts for the next month so she could testify in a court hearing. JA369. But, as the ALJ determined, Whitbeck did not make clear to Lind that the court hearing was before the Board and concerned unionization efforts. Whitbeck merely flashed Lind a copy of the subpoena on her phone, in too little detail for Lind to understand what the hearing involved. JA11 n.9.

Thereafter, union organizing activities continued. On March 20, Workers United advertised a "sip-in" event to promote unionization efforts at two other stores (Zeeb Road and State/Liberty). Whitbeck did not attend this event. JA401. But district manager Schmehl did, after the Zeeb Road

substitute store manager, who was covering for another manager's vacation, asked Schmehl to offer support. JA651-652. The event was spearheaded by third parties—not baristas—associated with the Union, who encouraged customers to bring in post-it notes with pro-union messages and post them on Starbucks' community board. Starbucks' policy is that its community board could not include advertisements, political or religious announcements, notices that disparaged Starbucks, or offensive material. JA13. So Schmehl removed post-it notes that customers had added. JA14, 135-136, 479.

### B. Administrative Proceedings

1. ***The NLRB Complaint***.  In April 2022, Workers United filed an unfair-labor-practice charge against Starbucks arising from Whitbeck's termination. JA734, 740. The Board then filed a consolidated complaint alleging that Starbucks violated the NLRA by discharging Whitbeck purportedly in retaliation for her union activity, participation in a Board hearing, and the Union's filing of a since-dismissed charge on her behalf. JA1 n.2.  Starbucks denied those claims, maintaining that Whitbeck was

terminated for violating Starbucks' two-partner rule and failing to request coverage from her supervisors.[2] JA816.

2. ***The ALJ's Decision***. On October 7, 2022, after holding a hearing, the Board's ALJ concluded that Starbucks had fired Whitbeck in retaliation for her labor organizing work and participation in a Board hearing. JA6-7. The ALJ did not find that Starbucks fired Whitbeck in retaliation for the Union's filing a since-dismissed unfair-labor-practice charge. JA19.

The ALJ applied the Board's two-step *Wright Line* test for labor retaliation. *See Wright Line*, 251 NLRB 1083, 1087 (1980). Under *Wright Line*, the Board first must show that "union animus was a substantial or motivating factor in the adverse employment action." JA18. Then, the "burden shifts to the employer" to show that it would have taken the same action "even in the absence of the protected conduct." JA18.

---

[2] On February 23, 2023, the Eastern District of Michigan granted the Board preliminary injunctive relief under 29 U.S.C. § 160(j). *Kerwin v. Starbucks Corp.*, 657 F. Supp. 3d 1002 (E.D. Mich. 2023). That relief included offering Whitbeck reinstatement, but excluded a nationwide injunction because the Board failed to show that Starbucks had implemented a company-wide anti-union policy. *Id.* at 1012-13. Because section 10(j) injunctions last only until the Board renders a final decision, both parties agreed dissolution was appropriate, and the injunction is no longer in effect. *See Kerwin v. Starbucks Corp.*, No. 22-cv-12761 (E.D. Mich.), Dkts. 48, 49 (letters suggesting case closing), 50 (order granting voluntary dismissal of appeal).

As to unlawful motive, the ALJ relied on a combination of factors without identifying any one as independently dispositive. *First,* the ALJ reasoned that Schmehl harbored animus against the Union because she "surveill[ed]" the pro-union sip-in at another location for a few hours and removed sticky notes from the community board. JA20. *Second*, the ALJ believed that Whitbeck was disciplined more harshly for violating the two-partner rule, whereas another shift supervisor received a final written warning. JA20; *see also* JA17 & n.19. *Third*, the ALJ found that Starbucks deviated from usual investigative practices by purportedly not probing further why Whitbeck could not stay at the store until B.G. returned. JA20-21. *Fourth*, the ALJ found the timing of Whitbeck's termination suspicious because she was in the middle of union organizing. JA21.

The ALJ then rejected Starbucks' defense that it would have discharged Whitbeck due to her policy violations, regardless of her union activity. JA21. Starbucks argued that similarly situated partners were terminated for similar violations regardless of their unionizing—in other words, Starbucks relied on comparator evidence.

For instance, Starbucks had discharged B.G., who was anti-union, for swearing at Whitbeck on the customer floor during the fight Whitbeck

initiated on February 27. JA818. But the ALJ rejected B.G. as a comparator because he was terminated for a different infraction—swearing—and Starbucks had not put in evidence about typical discipline for swearing in front of customers. JA21 n.28.

Starbucks also pointed to district manager Schmehl's testimony that on five to ten occasions she was involved in discharging partners for violating Starbucks' safety and security policies. JA17 n.20, 598. But the ALJ rejected that evidence as insufficiently detailed regarding the violations and circumstances. *Id.* The ALJ also faulted Starbucks for insufficient comparator evidence because a previous shift supervisor who reportedly violated the two-partner rule and pushed a coworker at Whitbeck's store was given a final written warning instead of termination. JA17.

As to remedies, the ALJ ordered Starbucks to reinstate Whitbeck with backpay and benefits, to pay her for any expenses incurred in searching for work, and to give her compensation for adverse tax consequences of receiving a lump-sum backpay award. JA21-22.

Both parties filed exceptions to the ALJ's decision and related briefs. JA1.

3. ***The Board's Decision***.  On August 9, 2023, the Board issued a final order affirming the ALJ's findings on the merits with some modifications. JA1.  The Board agreed with the ALJ's findings of retaliation and animus. JA1-4.  The Board further agreed that Starbucks failed to show that Whitbeck would have been terminated regardless, emphasizing the lack of evidence that other Michigan employees had been discharged for violating the two-partner rule.  JA4.

As to remedies, however, the Board expanded the ALJ's remedy to encompass compensatory damages flowing from the alleged unfair-labor practices, citing the Board's recent 3-2 decision in *Thryv*, 2022 WL 17974951, *review pending*, No. 23-60132 (5th Cir.).  JA1 n.3.  In *Thryv*, the Board "revisit[ed]" its precedent and held that employers henceforth must pay employees "*all direct or foreseeable pecuniary harms* suffered as a result of [an] unfair labor practice."  *Id.* at *9.  The Board expected "myriad" harms would now qualify, including credit-card late fees or debt, retirement-account penalties, lost homes or cars, transportation or childcare costs, out-of-pocket medical expenses, and "other costs simply in order to make ends meet."  *Id.* at *14-15 (citation omitted).

## STANDARD OF REVIEW

Where, as here, the Board adopts part of an ALJ's decision, this Court reviews both decisions. *See Adair Standish Corp. v. NLRB*, 912 F.2d 854, 856 (6th Cir. 1990). This Court reviews the Board's legal conclusions de novo and findings of fact for substantial evidence. *Conley v. NLRB*, 520 F.3d 629, 638 (6th Cir. 2008) (citing 29 U.S.C. § 160(e)-(f)); *see* 5 U.S.C. § 706.

## SUMMARY OF ARGUMENT

The Board's order warrants vacatur in two independent respects.

I. The Board's order violates the substantial-evidence standard, because the Board arbitrarily disregarded record evidence that refutes the Board's findings.

The Board found that Starbucks terminated Whitbeck for her labor organizing, her participation in Board proceedings, and the union's filing of a now-dismissed charge on her behalf. While acknowledging that Whitbeck violated Starbucks' safety and security rules by leaving one barista alone at night to run the store, the Board concluded that Whitbeck would have received a final written warning but for her protected activities.

The Board found that anti-union animus motivated Whitbeck's termination, but only after ignoring record evidence that contradicts the Board's conclusion. The Board found that a district manager's conduct at a

union sip-in demonstrates animus, but swept aside evidence the manager was lawfully monitoring non-employee union representatives and enforcing lawful Starbucks policies. The Board found that Starbucks' disparate treatment of Whitbeck compared to other employees indicates animus, but ignored the case-specific circumstances of Whitbeck's violation and comparator evidence that others received similar treatment for similar violations. The Board found that Starbucks' failure to investigate the reason Whitbeck needed to leave the store right at 7:00p.m. shows animus, but ignored the multiple opportunities Whitbeck had to bring that to the relevant managers' attention. The Board also found that the timing of Whitbeck's termination in the midst of a union-organizing campaign evidenced animus, but swept aside key context calling into question the Board's finding that the timing was "suspicious."

The record instead establishes that Starbucks terminated Whitbeck for violating the two-partner rule under particularly serious circumstances. The Board rejected Starbucks' legitimate business justifications, but ignored evidence about the aggravated nature of Whitbeck's violation and relevant comparator evidence in the record. Those infractions amply explain Whitbeck's termination independent of any protected labor activity.

II.  At minimum, this Court should vacate the Board's order because the Board's new remedy would require Starbucks to pay Whitbeck for all "direct or foreseeable pecuniary harms" of her termination.  JA5.  That remedy amounts to compensatory damages—money paid to Whitbeck to remedy economic injuries she allegedly suffered as a result of Starbucks' actions.

But section 10(c) of the NLRA does not authorize compensatory damages.  That provision only authorizes the Board to order employers to cease unfair labor practices and take "affirmative action … as will effectuate the policies of" the Act.  29 U.S.C. § 160(c).  That language limits the Board to traditional *equitable* remedies—compelling action or inaction.  Section 10(c) does not authorize *legal* remedies like compensatory damages.  The Supreme Court has long described the NLRB's authority in equitable terms.  And the rest of section 10(c), other statutes, and legislative history confirm that compensatory damages exceed the NLRB's power.

Reading section 10(c) to allow compensatory damages would raise serious constitutional concerns.  Article III and the Seventh Amendment require federal courts and juries—not agencies—to adjudicate cases involving private rights.  The Board's reading also raises serious concerns under the nondelegation doctrine, which requires Congress to articulate an intelligible

principle when delegating discretion to agencies. On the Board's view, nothing limits the Board's remedial powers save the Board's own policy views.

## ARGUMENT

### I.    The Board's Decision Violates the Substantial-Evidence Standard

The Board's order is unsupported by substantial evidence, *i.e.*, enough "relevant evidence" to convince a "reasonable mind" of the Board's "conclusion." *FiveCAP, Inc. v. NLRB*, 294 F.3d 768, 776 (6th Cir. 2002) (citation omitted); *see* 29 U.S.C. § 160(e). Under that standard, this Court has vacated Board orders for failing to "take into account whatever in the record fairly detracts from its determinations." *Clock Elec., Inc. v. NLRB*, 162 F.3d 907, 914 (6th Cir. 1998); *see Ohio Edison Co. v. NLRB*, 847 F.3d 806, 810-12 (6th Cir. 2017); *Ctr. Constr. Co. v. NLRB*, 482 F.3d 425, 439-40 (6th Cir. 2007).

This order reflects the same types of flaws that have prompted vacatur. Adopting the ALJ's analysis, the Board sidestepped record evidence that Whitbeck's termination stemmed from her aggravated violation of Starbucks' two-partner rule, not anti-union animus. The Board also downplayed evidence that the same manager terminated other partners for similar violations.

### A. The Board Lacked Substantial Evidence to Find that Anti-Union Animus Motivated Whitbeck's Termination

The first step of the Board's *Wright Line* test for labor retaliation requires the Board to show that "the employer's action was motivated, at least in significant part, by anti-union animus." *Dayton Newspapers, Inc. v. NLRB*, 402 F.3d 651, 665 (6th Cir. 2005). Here, the Board relied on a mix of four findings that purportedly collectively showed that Starbucks' anti-union "animus" was a "motivating factor" in Whitbeck's termination. JA3.

Each finding overlooks significant contrary evidence. Regardless, if even one finding is unsupported by substantial evidence, this Court should vacate the Board's order and remand, because it is unclear whether the remaining findings would support the Board's conclusion that Whitbeck's termination reflected anti-union animus. *See Calcutt v. FDIC*, 598 U.S. 623, 624-25, 628-29 (2023) (vacatur required where some bases for agency decision are invalid; courts cannot "affirm the administrative action by substituting what it considers to be a more adequate or proper basis" (citation omitted)).

1. ***Schmehl's Attendance at the Sip-in.*** Adopting the ALJ's findings, the Board surmised that because district manager Schmehl was present during a union event at another store and removed pro-union messages, she harbored "animus against the Union and its supporters" that was a motivating

factor in Whitbeck's discharge. JA3, 20. As noted, Schmehl was present during a union-organized "sip-in" at the Zeeb Road store, which Whitbeck did not attend. During the meeting, union representatives (not Starbucks partners) encouraged Starbucks customers to post sticky notes bearing pro-union messages on Starbucks' community board. JA119-122, 133-134. Schmehl removed messages at least three times. JA15, 20, 132-133.

The Board found nothing unlawful about this conduct. JA3. Nonetheless, the Board adopted the ALJ's finding deeming Schmehl's actions "unusual" and as "arguably creat[ing] an impression of surveillance where a reasonable employee would assume that their … protected activities had been placed under surveillance." JA20.

The assumption that a supervisor who purportedly expresses hostility to a particular unionization effort must necessarily want to terminate pro-union employees is inherently specious. The Board must make a "particularized showing" of animus and "cannot simply infer such animus from separate acts involving other employees"—never mind *non-employees*. *FiveCAP*, 294 F.3d at 781. Otherwise, the Board could rely on "[s]uspicion, conjecture and theoretical speculation"—which "register[s] no weight on the

substantial evidence scale"—to sustain its initial burden of showing animus. *See TRW, Inc. v. NLRB*, 654 F.2d 307, 312 (5th Cir. Unit A. 1981).

Worse, the Board ignored key facts about the sip-in that refute any inference that Schmehl acted with animus against Whitbeck's unionization activities. To start, to the extent Schmehl was surveilling anything at the sip-in, she was legally monitoring *non-employee* union activity, including disruptive actions by third-party union organizers. When union organizers are non-employees, employers "possess[] the … right to observe his activities while he [i]s there." *Oakwood Hosp. v. NLRB*, 983 F.2d 698, 703 (6th Cir. 1993). "[T]he degree of surveillance, no matter how 'out of the ordinary,' is irrelevant" in such circumstances. *NLRB v. S. Md. Hosp. Ctr.*, 916 F.2d 932, 939 (4th Cir. 1990) (per curiam); *contra* JA3 (referring to Schmehl's "unexplained 3-hour presence").

The Board never explains why an employee at a different store might reasonably believe themselves *unlawfully* surveilled while on-duty simply because a district manager went to a different store—at the behest of that store's substitute manager, JA651-653—to lawfully monitor a situation where third parties were trying to enlist customers in a union campaign. Managers who lawfully confine themselves to monitoring non-employee conduct hardly

create an inference of unlawful animus against pro-union employees everywhere in the company.

Further, the Board overlooked that Schmehl's conduct in removing sticky notes had an innocuous explanation—namely, that Starbucks prohibits political messages, notices that disparage Starbucks, and advertising on its message boards. JA13. The Board did not dispute that the union sticky notes were inappropriate—only that Schmehl did not need to remove them because the substitute store manager "could have [removed the notes] without assistance." JA3. But if every punctilious manager were treated as acting suspiciously simply because they opted to remedy rule violations when they encountered them, the Board could always find animus even where none existed.

Conversely, the Board ignored evidence that sowed doubt that Schmehl would have acted on supposed anti-union animus by terminating Whitbeck. The Board did not dispute that Schmehl and store manager Lind were unaware that Whitbeck "acted as a lead organizer." JA20 n.24; *see also* JA106, 570-571. Nor did the Board dispute that Schmehl never knew about the charge the Union filed on Whitbeck's behalf before recommending termination. JA4, 599-600. The Board said Whitbeck "stood out among her fellow union

supporters" in other ways.  JA20 n.24.  But one way—"violating the two-employee rule"—was the neutral basis Starbucks gave for her termination. JA20 n.24.

2. ***Disparate Treatment.***  The Board found that Starbucks "subjected Whitbeck to disparate treatment" by terminating her employment for violating the two-partner rule.  JA3.  The Board relied on the ALJ's determination that the proper discipline for the two-partner rule was a final written warning and that a different partner, Adam Hess, received such a warning for violating the rule.  But the Board overlooked significant countervailing evidence that rebutted any disparate treatment.

To start, rather than focusing on Whitbeck's specific violation of the two-partner rule—abandoning a partner to operate an open store alone at night—the ALJ consulted a "job aid" concerning discipline for violations of the broader rule that partners should not *enter* stores alone and that violations should be punished with a final warning before termination.  JA17 n.19.  The ALJ thus erred in inferring that a final warning was the usual discipline whenever partners deliberately leave the store so that only one partner remains.  That inference—which the ALJ rested entirely on parsing Starbucks' internal documents—mixed apples and oranges.  Entering a store

26

alone, including off-hours, involves different risks to partners and customers than abandoning an open store at night to a single barista. The ALJ thus erred in assuming that a final warning fit Whitbeck's violation.

Compounding this error, the ALJ ignored that Starbucks' disciplinary guidelines leave significant room to fit discipline to particular incidents. Starbucks' Partner Manual states that discipline will be based "on the seriousness of the situation and the surrounding circumstances," and the choice of discipline rests with the manager's discretion after investigation. JA966. The Manual adds that "[i]n cases of serious misconduct, immediate separation from employment may be warranted." JA966. Further, the Manual specifies that "[v]iolation of safety and/or security rules"—the two-partner rule is such a rule—is an "[e]xample[] of serious misconduct" that can result in "immediate separation." JA966.

The ALJ failed to consider whether Whitbeck's deliberate violation of the two-partner rule involved aggravating circumstances that warranted immediate dismissal. JA20. Whitbeck acknowledged she knew she was violating the policy. She contacted store manager Lind shortly after B.G. left the store, without any sense of whether B.G. would return. Yet, minutes later, Whitbeck left without mentioning to Lind or district manager Schmehl that

the store would have just one barista at the helm—without keys to the store or access to the store's safe—or asking for help. JA389-390, 799, 471; *supra* pp. 6-7. As Starbucks' termination notice emphasized, that failure to communicate was independently problematic because it prevented supervisors from immediately taking action to safeguard the store. JA816.

Instead of considering these case-specific circumstances, the ALJ and Board zeroed in on evidence about another shift supervisor, Adam Hess, who allegedly received a "Final Written Warning" for violating the two-partner rule. The ALJ relied on testimony from a Main and Liberty former store manager about Hess's discipline to conclude that Whitbeck "received disparate treatment" because she was terminated, whereas Hess was given a final written warning. JA20 & nn.25-26.

But here again, the Board ignored contrary record evidence. Whitbeck was terminated for an aggravated violation of the two-partner rule. She deliberately left a partner alone in the store and failed to communicate the coverage issue beforehand. JA816, 864. Schmehl had also terminated previously "five to ten" partners with no prior corrective action for violations of Starbucks' safety and security policies, JA598—evidence the agency arbitrarily declined to consider because Schmehl had not provided "details"

about the "violations and circumstances" underlying those terminations. JA17 n.20. But giving Schmehl's disciplinary history "no weight" as comparator evidence violates the substantial-evidence standard. *See* JA17 n.20. The Board cannot "ignore evidence that contradicts [its] conclusions." *See NLRB v. Seawin, Inc.*, 248 F.3d 551, 556 (6th Cir. 2001).

The Board similarly ignored evidence that B.G. was terminated for his conduct on February 27—conduct inextricably intertwined with Whitbeck's own. The Board faulted Starbucks for not putting in evidence about typical discipline for B.G.'s specific offense of swearing. JA21 n.28. Without that evidence, the Board claimed it could not evaluate how the "decision to discharge B.G. relates to [Starbucks'] decision to discharge Whitbeck." JA21 n.28. But the terminations were obviously related. B.G. and Whitbeck were terminated for conduct that occurred on the same day and involved both of them. Schmehl decided to terminate both on March 21, and they were both terminated around the same time. JA590, 659, 816, 818. Moreover, B.G. was a "publicly anti-union" partner at the Main and Liberty store—a relevant fact as to whether Whitbeck's union activity or her rule violation caused her termination. JA458. The Board's refusal to consider B.G.'s related

termination as relevant context warrants vacatur, especially when coupled with all the other evidence favoring Starbucks that the Board sidestepped.

3. ***Investigative Irregularity.*** The ALJ cited Starbucks' purported "deviation from its investigative practice in determining the level of discipline for Whitbeck" by failing to "follow up" with her about her reason for violating the two-partner rule. JA3-4; *see* JA20-21. Whitbeck testified to the ALJ that she needed to leave right at 7:00p.m. to visit her grandfather, who allegedly had a heart attack earlier that day, and faulted Starbucks for not discovering that emergency sooner. JA20, 21 n.28.

But other, undiscussed evidence undercuts that finding. Schmehl testified that "exigent circumstances"—like a family member's illness—would have been considered during the investigation. JA676. Whitbeck, however, inexplicably failed to raise this serious family emergency at any point until the ALJ hearing, despite many opportunities. Whitbeck texted Lind just before abandoning the barista, but made no mention of her grandfather or need to leave the barista alone, only complaining about B.G. JA799. Whitbeck's incident report, which she preemptively filed the day after her policy violation, simply noted she had "something serious" to get to after work. JA803. Lind interviewed Whitbeck the next day about the incidents, asking why she had

not contacted Lind earlier about the fight with B.G. and why Whitbeck did not contact Lind or another store at 6:30p.m. when B.G. had not yet taken his break. JA13. Whitbeck still never mentioned a family emergency, JA13, instead waiting until the ALJ hearing.

The ALJ and Board thus misconstrued Starbucks' corrective action policy, which does not guarantee that Starbucks will press partners for detailed explanations of every rule violation. The policy merely instructs that Starbucks will consider "the seriousness of the situation and the surrounding circumstances" in determining the appropriate level of discipline. JA966, 992. That is what Starbucks did here based on its reasonable investigation of the circumstances of Whitbeck's serious rule violation.

4. **Timing.** The Board affirmed the ALJ's finding that the timing of Whitbeck's discharge in the midst of a union-organizing campaign was "suspicious" and thus evidenced animus. JA21. Whitbeck violated the two-partner rule on February 27 and was terminated on April 11. JA2, 16-17. The agency specifically considered it "suspicious" that Schmehl's decision to terminate Whitbeck came one day after the union sip-in event, and 2.5 weeks after Schmehl saw Whitbeck at a Board proceeding. JA21. The Board also relied on a timing point that the ALJ rejected: that Starbucks' counsel had

received notice by March 29 that the Union had filed an unrelated and since-rejected charge with the Board on Whitbeck's behalf.  JA4.

*First*, the agency ignored record evidence undercutting any inference of abnormal delay.  Critically, Schmehl decided to terminate Whitbeck and B.G. on March 21, the day after Schmehl finally received a statement from the partner whom Whitbeck abandoned in the store.  JA82, 590, 659, 812, 999.  Whitbeck was terminated on April 11 and B.G. was terminated on April 14.  JA816, 818.  That two partners were terminated around the same time for conduct arising from incidents on the same day at the same store after tandem investigations gives further context to the timing—context the agency ignored.

*Second*, Schmehl's decision to discharge Whitbeck one day after the union sip-in event at a different store does not suggest that anti-union animus motivated Whitbeck's termination.  As discussed, the Board never explains how Schmehl's purported animus toward non-partner union organizers motivated her to terminate Whitbeck.  *Supra* pp. 22-26.

*Third*, the Board's conclusion that the Union's filing of a charge against Starbucks on Whitbeck's behalf contributed to her termination ignores key context.  The ALJ and the Board's orders conflict—the ALJ found that the

Union's filing of the charge did not "factor[] into" the decision to "discharge Whitbeck." JA19. The Board disagreed. JA4. Where the orders of the ALJ and the Board "conflict," a "reviewing court must examine the evidence more carefully." *W.F. Bolin Co. v. NLRB*, 70 F.3d 863, 871 (6th Cir. 1995).

Here, Schmehl decided to terminate Whitbeck on March 21, but the Union filed the charge with the Board on March 23. JA19. Undisputedly, neither Schmehl nor Lind knew about the charge until *after* Whitbeck's April 11 termination. JA19 &n.23, 241, 599-600. Given this evidence, the ALJ found that Whitbeck's discharge "was already being processed" before Starbucks received notice of the charge. JA19.

The Board, however, found that Starbucks' "legal department" was aware of the charge by March 29, and their knowledge motivated Starbucks' authorization of Whitbeck's termination on April 3. JA4. But that conclusion fails to grapple with the ALJ's finding that Starbucks was already processing Whitbeck's discharge when Starbucks' legal department learned about the charge. JA19 & n.23; *see Seawin*, 248 F.3d at 556. No record evidence suggests Starbucks' legal department exhibited anti-union animus directed at Whitbeck, or even knew that Whitbeck was a principal organizer at her store,

let alone that the legal department would have vetoed the already-in-progress termination but for this alleged animus.

## B. The Board Ignored Evidence of Starbucks' Substantial Business Justifications for Whitbeck's Termination

Under the Board's *Wright Line* test for retaliation, if the agency shows animus, the burden shifts to the employer to show "that the employee would have been dismissed even if the protected … activity had not taken place." *Dayton Newspapers*, 402 F.3d at 665. Here, the Board's order independently warrants vacatur because the Board failed to consider substantial business justifications for Starbucks' termination decision.

*First*, the Board found that Starbucks "failed to present any evidence" that termination was appropriate discipline for a knowing violation of the two-partner rule and that a final written warning is ordinarily the discipline for violating the two-partner rule. JA4. But, as discussed, those findings ignore that Whitbeck was terminated for violating the two-partner rule and her related failure to communicate a need for coverage, which aggravated the problem. JA816; *supra* pp. 27-28. Starbucks' Manual disclaims one-size-fits-all discipline and emphasizes the need to consider aggravating and mitigating circumstances for violations, as happened here. *Supra* pp. 5-6, 27.

*Second*, the Board faulted Starbucks for not producing comparator evidence, yet failed to consider the comparator evidence in the record. JA4. The Board "[i]n particular" relied on the ALJ's finding that the "absence of evidence that any other employee in one of the Respondent's Michigan stores ever had been discharged for violating the [two-partner] rule" necessitated rejecting Starbucks' defense. JA4.

Again, the Board erroneously downplayed comparator evidence in the record—evidence such as Schmehl's termination of five to ten other partners whom violated Starbucks' safety and security policies for the first time and that B.G. was also terminated for his conduct on February 27. *Supra* pp. 28-30. The Board thus failed "to consider all the circumstances" in rejecting Starbucks' affirmative defense and failed to consider all relevant evidence in the record. *Ohio Edison Co.*, 847 F.3d at 810.

## II.  The Board's Damages Remedy Is Unlawful

At a minimum, this Court should vacate the Board's order based on its award of compensatory damages. Recently, the Board bucked decades of precedent and asserted authority to award employees "all direct or foreseeable pecuniary harms" as a matter of course. *Thryv*, 2022 WL 17974951, at *1. Here, the Board applied that ruling retroactively and

compelled Starbucks to compensate Whitbeck for any "direct or foreseeable pecuniary harm[] suffered as a result" of her termination.  JA5.

That broad compensatory-damages remedy exceeds the Board's powers.  Section 10(c) of the NLRA confines the Board to traditional equitable remedies, *i.e.*, ordering the cessation of unfair labor practices or "affirmative action … as will effectuate the policies of" the Act.  29 U.S.C. § 160(c).  Further, constitutional-avoidance principles disfavor the Board's interpretation, given the grave constitutional concerns under Article III and the Seventh Amendment that would arise if agencies—not courts—resolved traditional common-law tort and contract claims.  The Supreme Court is currently evaluating similar constitutional concerns in *SEC v. Jarkesy*, No. 22-859 (argued Nov. 29, 2023).  In addition, the Board's assertion of unbounded remedial powers raises concerns under the nondelegation doctrine.[3]

### A. The Board Awarded Compensatory Damages

In *Thryv*, the Board "revisit[ed]" its "standard remedy" in unfair-labor-practice cases and charted a novel course.  2022 WL 17974951, at *9.  By a 3-2

---

[3] Petitioners in a pending Sixth Circuit case have also challenged the Board's statutory authority to impose a *Thryv* remedy.  *See* Pet'r Br. 35-40, *NLRB v. MetroMan IV, LLC*, No. 23-1472 (6th Cir.).  The *MetroMan* petitioners do not raise constitutional arguments nor the full range of statutory arguments Starbucks raises in this case.

vote, the Board decided that, "to best effectuate the purposes of the Act," the Board would now award compensation for "all direct or foreseeable pecuniary harms." *Id.* at *1. As the majority observed, "myriad … possible examples" might fit that new definition, including credit-card fees, mortgage payments, childcare bills, and medical expenses. *Id.* at *14-15 (citation omitted).

The Board implemented that new interpretation here, requiring Starbucks to make Whitbeck "whole for any loss of earnings and other benefits, and for any other direct or foreseeable pecuniary harms, suffered as a result of the discrimination." JA5. For example, the Board ordered Starbucks to pay "reasonable search-for-work and interim employment expenses." JA6.

The Board's order compels Starbucks to pay compensatory damages—a remedy "intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct." *State Farm v. Campbell*, 538 U.S. 408, 416 (2003) (citation omitted). In wrongful-discharge tort cases, compensatory damages make the injured party whole for the losses they suffer—losses are not limited to "out-of-pocket loss of income" and can include things like "emotional and mental distress damages." *Phillips v. Butterball Farms Co.*, 531 N.W.2d 144, 251-52 (Mich. 1995) (citation omitted). For

example, tort-law "compensatory damages" include the "expenses of finding new employment," *Smith v. Atlas Off-Shore Boat Serv., Inc.*, 653 F.2d 1057, 1064 (5th Cir. Unit A Aug. 1981), just like the "search-for-work" expenses the Board ordered here, JA6.  Indeed, the Board's own manual confirms that certain expenses, "such as the loss of a car or house due to the discriminatee's inability to make monthly payments" are "compensable damages."  NLRB, *Casehandling Manual, Part 3, Compliance Proceedings* § 10506.1 (Oct. 19, 2020), https://tinyurl.com/rfbwchwd.

### B. The NLRA Does Not Authorize Compensatory Damages

Section 10(c) of the NLRA authorizes the Board to order employers to "cease and desist from" unfair labor practices and "take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of" the Act.  29 U.S.C. § 160(c).  That language authorizes only equitable relief.  Section 10(c) does not authorize compensatory damages—"the classic form of *legal* relief."  *See Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255 (1993); *see also Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002).  Thus, this Court should vacate the compensatory-damages portion of the Board's Order.

1. ***Statutory Text***.  The NLRA's text and longstanding Supreme Court precedent confirm that the Board lacks power to order legal remedies, including compensatory damages.  Section 10(c) lets the Board order employers to "take … affirmative action," such as "reinstatement … with or without back pay," or to compel inaction, *i.e.*, to "cease and desist."  29 U.S.C. § 160(c).  That remedial power captures equity to a T:  Equity "compel[s] action or inaction."  Samuel L. Bray, *The System of Equitable Remedies*, 63 UCLA L. Rev. 530, 553 (2016).  Courts of equity could both order "restraint of a contemplated or threatened action" and "require affirmative action."  *Ex parte Lennon*, 166 U.S. 548, 556 (1897).  The Board's remedial powers are identical, and omit any reference to damages—the quintessential legal remedy.

Thus, nearly 70 years ago, the Supreme Court recognized "Congress did not establish a general scheme authorizing the Board to award full compensatory damages for injuries caused by wrongful conduct."  *UAW-CIO v. Russell*, 356 U.S. 634, 643 (1958).  For example, the Court observed that "medical expenses … are beyond the scope of present Board remedial orders."  *Id.* at 646.  Such relief would "supersed[e] common-law actions" to "recover damages caused by … tortious conduct."  *Id.* at 642.  Yet that is exactly the type of compensatory, common-law relief the Board sought here.

Moreover, the Supreme Court has repeatedly described the Board's section 10(c) authority in purely equitable terms. The Court has deemed the Board's "cease and desist" orders "somewhat analogous" to "injunction[s]"— the classic equitable remedy. *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945). The Court has compared a Board order requiring an "affirmative action" to a "mandatory injunction[]." *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 178 n.4 (1973). And the Court has described section 10(c) relief as "discretionary," *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 197 (1941)— another hallmark of equity, *see Salazar v. Buono*, 559 U.S. 700, 714 (2010) (plurality op.). All of this reinforces section 10(c)'s bright-line distinction: The Board can pick equitable remedies, but legal remedies like compensatory damages are off-limits.

2. ***Context.*** The rest of section 10(c)'s text reinforces that the Board's remedial power is only equitable. Section 10(c)'s sole example of an order commanding "affirmative action" is "reinstatement of employees with or without backpay." 29 U.S.C. § 160(c). As this Court has observed, "reinstatement is an equitable remedy." *Fleming v. Ayers & Assocs.*, 948 F.2d 993, 998 (6th Cir. 1991) (discussing ERISA). The same goes for backpay. *Curtis v. Loether*, 415 U.S. 189, 197 (1974) ("In Title VII cases the courts of

appeals have characterized back pay as an integral part of an equitable remedy."). When the Board includes backpay in a reinstatement order, the Board's combined relief is an equitable "form of restitution." *See id.*

Meanwhile, reading section 10(c) to let the Board award compensatory damages would create serious anomalies. As noted, section 10(c) spells out "affirmative action" the Board can impose including "reinstatement with or without back pay." 29 U.S.C. § 160(c). But section 10(c) also prohibits the Board from ordering "reinstatement" or "back pay" where the employee "was suspended or discharged for cause." *Id.* If the Board could order other remedies, that restriction makes no sense. The Board would apparently remain free to award compensatory damages and other unspecified remedies to employees who were fired for cause but nonetheless affected by unfair labor practices. Courts ordinarily interpret statutes to avoid such "anomalous results." *Cortez Byrd Chips, Inc. v. Bill Harbert Constr. Co.*, 529 U.S. 193, 202 (2000).

3. ***Other Statutes.*** Related statutes further show that section 10(c) authorizes only equitable relief. In Title VII of the Civil Rights Act, Congress "modeled" that Act's remedial provision—section 706(g)—on section 10(c). *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 419 (1975). Section 706(g) is

expressly limited to equitable relief: A court may "enjoin [an employer] from engaging in [an] unlawful employment practice, and order such affirmative action as may be appropriate, which may include … reinstatement …, with or without back pay …, or any *other equitable relief*." 42 U.S.C. § 2000e-5(g)(1) (emphasis added). That language evinces Congress's understanding that stopping employers from acting unlawfully and ordering "affirmative action" such as "reinstatement" are forms of "equitable relief."

Buttressing the point, the Supreme Court has used section 10(c)'s "meaning" as "guidance as to the proper meaning of the same language in § 706(g)." *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 849 (2001). And the Court has held that section 706(g) "does not allow awards for compensatory … damages." *United States v. Burke*, 504 U.S. 229, 238 (1992). Precisely because Title VII's original remedies excluded compensatory damages, in 1991 Congress amended Title VII to let victims of intentional discrimination recover damages after a jury trial. *See id.* at 241 n.12. If section 706(g)'s original language does not authorize compensatory damages, neither does section 10(c)—particularly because section 706(g) is the "broader" of the two remedial provisions. *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 770 n.29 (1976).

By contrast, when Congress wants to authorize compensatory damages, Congress says so directly and ensures that a court—not an agency—decides the case. For instance, the Labor-Management Relations Act creates a civil cause of action against unions for certain unfair labor practices and expressly authorizes an injured party to bring a district-court suit to "recover the damages by him sustained." 29 U.S.C. § 187(b). The Migrant and Seasonal Agricultural Worker Protection Act too permits district courts to award "all appropriate relief, including rehiring or reinstatement of the worker, with back pay, *or damages*." *Id.* § 1855(b) (emphasis added). And the Family and Medical Leave Act authorizes courts to award damages including "any actual monetary losses sustained." *Id.* § 2617(a)(1)(A)(i)(II).

Congress clearly knew how to provide for damages in myriad labor statutes. By excluding similar language from the NLRA, Congress declined to authorize compensatory damages in NLRA cases. *See Ysleta Del Sur Pueblo v. Texas*, 142 S. Ct. 1929, 1939 (2022) (citation omitted) ("[D]ifferences in language … convey differences in meaning.").

4. ***Legislative History.*** The Act's legislative history further refutes the Board's newfound power to award compensatory damages. As originally drafted, the NLRA would have allowed the Board to order an employer "to

take affirmative action, *or to pay damages*, or to reinstate employees." S. 2926, 73d Cong. § 205(c) (as introduced Mar. 1, 1934) (emphasis added), *reprinted in* 1 NLRB, *Legislative History of the National Labor Relations Act, 1935*, at 6-7 (1949). But business representatives raised "due process" concerns and that language was dropped—illustrating yet again that the NLRA's omission of damages as a remedy was intentional. *See Hearing on S. 2926 Before the S. Comm on Educ. & Lab.*, 73d Cong. 362 (1934) (statement of James A. Emery, Nat'l Ass'n of Mfrs.), *reprinted in* 1 NLRB, *Legislative History, supra*, at 396.

### C. Reading the NLRA to Permit Compensatory Damages Would Raise Multiple Constitutional Problems

This Court ordinarily avoids interpreting statutes in a way that "raise[s] a multitude of constitutional problems." *United States v. Erpenbeck*, 682 F.3d 472, 476 (6th Cir. 2012) (citation omitted). Reading section 10(c) to permit compensatory damages raises serious constitutional concerns under Article III, the Seventh Amendment, and the nondelegation doctrine—problems that Starbucks' reading avoids.

1. ***Article III and Seventh Amendment Problems.*** Article III and the Seventh Amendment reserve to courts—and, specifically, juries—the power to adjudicate private damages suits. In *Jarkesy*, the Fifth Circuit held that the SEC's imposition of civil fraud penalties violates the Seventh Amendment

44

because those proceedings are "akin to traditional actions at law to which the jury-trial right attaches." *Jarkesy v. SEC*, 34 F.4th 446, 451 (5th Cir. 2022). The Supreme Court is currently reviewing that decision. *Jarkesy*, No. 22-859 (argued Nov. 29, 2023). Whatever the Supreme Court decides about SEC administrative penalties, the Board's award of compensatory damages to private parties strikes at the heart of the private rights the Constitution reserves to courts and juries.

Start with the basics: Article III vests "[t]he judicial Power of the United States" in federal courts alone. U.S. Const. art. III, § 1. Assigning judicial power to executive-branch adjudicators violates the separation of powers and undermines "the integrity of judicial decisionmaking." *Stern v. Marshall*, 564 U.S. 462, 484 (2011). As an exception, agencies can adjudicate so-called "public rights"—"matters which arise between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments." *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1373 (2018) (cleaned up). But *private* rights, like "wholly private tort, contract, and property cases," must be decided by "Article III judges in Article III courts." *Stern*, 564 U.S. at 484, 490 (cleaned up).

In a similar vein, the Seventh Amendment guarantees jury trials "[i]n Suits at common law." U.S. Const. amend. VII. Thus, cases that involve private rights "must be tried under the auspices of an Article III court" with the "right to a jury trial whenever the cause of action is legal in nature." *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989).

The Board's interpretation would violate those constitutional guarantees by arrogating to the agency the power to impose compensatory damages—"the classic form of legal relief." *See Mertens*, 508 U.S. at 255 (emphasis omitted). Such damages intrude into tort and contract claims— classic private rights that courts must adjudicate. *See Stern*, 564 U.S. at 490. Tort law's basic function is to "compensate a plaintiff for the injury caused by the defendant's wrongful breach." *Curtis*, 415 U.S. at 195. "[I]n suits for breach of contract" too, "compensatory damages" are the "traditionally available" remedy. *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 220-21 (2022) (citation omitted). By seeking to "restor[e]" employees "to the situation they would have inhabited but for [an employer's] unfair labor practice," *Thryv*, 2022 WL 17974951, at *15, the Board intrudes into private-rights adjudications.

Indeed, since 1940 the Supreme Court has understood that Board proceedings are "not for the adjudication of private rights" based on the "narrowly restricted" nature of proceedings that have as their "immediate object" the prevention of unfair labor practices, not remedying individual employees' harms. *Nat'l Licorice Co. v. NLRB*, 309 U.S. 350, 362-63 (1940). The Board's assertion of authority to "ensure[] affected employees are made whole for the consequences of [an employer's] unlawful conduct" strays beyond that mandate. *See Thryv*, 2022 WL 17974951, at *9.

In *Thryv*, the Board recognized that "consequential damages"—a type of compensatory damages—are "legal damages" "more suited for the common law of torts and contracts." *Id.* at *13-14. Yet the Board inexplicably disclaimed "Seventh Amendment concerns" for other compensatory damages, citing *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 48 (1937). *Thryv*, 2022 WL 17974951, at *16. But *Jones & Laughlin* rejected a Seventh Amendment challenge to a Board order imposing reinstatement with backpay, not damages. 301 U.S. at 48. As the Supreme Court explained, the monetary relief there (backpay) was "incident to equitable relief" (reinstatement). *Id.* And that makes sense because those two remedies traditionally go hand in hand. *Curtis*, 415 U.S. at 197. By contrast, here, the Board held Starbucks

liable for *all* "direct or foreseeable pecuniary harms," even harms not traditionally considered incident to equitable relief. JA5. As the *Thryv* dissenters observed, the Board has "obviously run[] headlong into the Seventh Amendment's guarantee of the right to have such claims tried before a jury." 2022 WL 17974951, at *27 (Kaplan & Ring, JJ., dissenting in part).

The Board's anticipated mechanics of calculating compensatory damages confirm the agency would supplant the jury's traditional role. Courts rely on jury trials to fairly calculate damages awards and identify harms that are too remote to pin on defendants. The Board envisions adjudicating the same in "compliance proceedings"—another round of full-bore agency adjudication. *Id.* at *17 (majority op.). Apparently, further ALJ proceedings on damages will ensue, where employees may testify, the Board may offer documentary evidence, and the agency will decide what injuries were "foreseeable." *Id.* at *18-19. That "time-consuming" and "wide-ranging" inquiry into damages falls beyond the Board's ken, and parallels private damages suits ordinarily decided by courts. *See id.* at *27 (Kaplan & Ring, JJ., dissenting in part).

2. **Nondelegation Problems.** The Board's interpretation also raises serious nondelegation concerns, by handing the agency an apparent blank

check to impose any remedy the agency sees fit.  Because Article I vests "[a]ll legislative Powers herein granted" in Congress, U.S. Const. art. I, § 1, Congress may not transfer "legislative power to another branch." *Gundy v. United States*, 139 S. Ct. 2116, 2121 (2019) (plurality op.); *accord Oklahoma v. United States*, 62 F.4th 221, 238 (6th Cir. 2023).  Accordingly, Congress cannot grant agencies standardless discretion over regulatory decisions, but must instead "suppl[y] an intelligible principle to guide the delegee's use of discretion." *Gundy*, 139 S. Ct. at 2123 (plurality op.).

That "nondelegation inquiry" bears on "statutory interpretation." *See id.*  Courts avoid reading statutes to create "unconstitutional delegation[s]." *Nat'l Fed. of Indep. Bus. v. OSHA*, 595 U.S. 109, 126 (2022) (Gorsuch, J., concurring).  For instance, this Court recently interpreted the Public Health Service Act as not authorizing a pandemic eviction moratorium to avoid "a nondelegation problem." *Tiger Lily, LLC v. U.S. Dep't of Hous. & Urb. Dev.*, 5 F.4th 666, 672 (6th Cir. 2021).

So too here, the Board's interpretation raises profound nondelegation problems.  In the Board's view, section 10(c)'s reference to "affirmative action … as will effectuate the policies of" the Act, 29 U.S.C. § 160(c), lets the Board pick any remedy consistent with its own views of labor policy.  *Thryv* even

suggest "the limits of the Board's statutory remedial authority" might stretch far beyond compensatory damages. 2022 WL 17974951, at *10 n.10.

But the Supreme Court has long prohibited agencies from charting their own course based on their views of statutory policy. Since 1935, statutes allowing the President to regulate as would "tend to effectuate" or as "necessary to carry out" a statute's "purposes" have crossed the line. *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 521 n.4, 541-42 (1935); *Panama Refin. Co. v. Ryan*, 293 U.S. 388, 407, 430 (1935). This Court should not adopt an interpretation that runs headlong into nondelegation principles when another reading avoids them entirely. Traditional equity practice—not the Board's policy preferences—cabins the Board's discretion to pick remedies.

**CONCLUSION**

The NLRB's application for enforcement should be denied.

Dated: February 12, 2024

Respectfully submitted,

/s/ Lisa S. Blatt
LISA S. BLATT
  *Counsel of Record*
SARAH M. HARRIS
TYLER J. BECKER
DANA L. SCHNEIDER*
WILLIAMS & CONNOLLY LLP
  *680 Maine Avenue SW*
  *Washington, DC 20024*
  *(202) 434-5000*
  *lblatt@wc.com*

\*  Admitted in Pennsylvania.  Practice in the District of Columbia supervised by members of the D.C. Bar as required by D.C. App. R. 49(c)(8).

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS**

1. This document complies with the word limit of Fed. R. App. P. 32(a)(7) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 9,836 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Century Expanded BT, size 14.

*/s/ Lisa S. Blatt*
LISA S. BLATT

## CERTIFICATE OF SERVICE

I hereby certify that, on February 12, 2024, true and correct copies of the foregoing Opening Brief for Respondent Starbucks Corporation was filed with the Clerk for the United States Court of Appeals for the Sixth Circuit and served on the parties through the Court's electronic CM/ECF filing system.

/s/ Lisa S. Blatt
LISA S. BLATT