RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0305p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

| | |
|---|---|
| NATIONAL LABOR RELATIONS BOARD, *Petitioner*, WORKERS UNITED, *Intervenor*, *v.* STARBUCKS CORPORATION, *Respondent*. | No. 23-1767 |

On Application for Enforcement of an Order of the National Labor Relations Board.
Nos. 07-CA-292971; 07-CA-293916.

Argued: October 31, 2024

Decided and Filed: November 5, 2025

Before: BATCHELDER, STRANCH, and READLER, Circuit Judges.

## COUNSEL

**ARGUED:** Eric Weitz, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Petitioner. Sarah M. Harris, WILLIAMS & CONNOLLY LLP, Washington, D.C., for Respondent. **ON BRIEF:** Ruth Burdick, Milakshmi Rajapakse, David Seid, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Petitioner. Sarah M. Harris, Lisa S. Blatt, Tyler J. Becker, Dana S. Gotfryd, WILLIAMS & CONNOLLY LLP, Washington, D.C., for Respondent.

READLER, J., delivered the opinion of the court in which BATCHELDER, J., concurred. STRANCH, J. (pp. 36–45), delivered a separate opinion concurring in the judgment in part and dissenting in part.

---

**OPINION**

---

READLER, Circuit Judge. After working as a shift supervisor at a Starbucks café for nearly three years, Hannah Whitbeck led a movement to organize a union there. Several months into that campaign, Starbucks fired her. In its termination letter, the company justified its decision with a seemingly innocuous explanation: Whitbeck left an employee alone in the café for roughly half an hour, without telling any supervisor or co-manager, in violation of company policy.

Through the filing of an administrative complaint, the National Labor Relations Board challenged this explanation. In the Board's view, Starbucks discharged Whitbeck due to her organizing activity, thereby committing an unfair labor practice in violation of § 8(a)(1), (3), and (4) of the National Labor Relations Act. An Administrative Law Judge agreed. *Starbucks Corp.*, 372 NLRB No. 122, slip op. at 21, 2023 WL 5137739 (Aug. 9, 2023). The Board later affirmed that decision and expanded the statutory remedy, ordering Starbucks to compensate Whitbeck for any "direct or foreseeable pecuniary harms" suffered because of the anti-union discrimination against her. *Id.* at 4–5.

We grant the Board's petition for enforcement of its decision that Starbucks committed an unfair labor practice. But because the Board exceeded its statutory authority in awarding Whitbeck "direct or foreseeable" monetary damages, we vacate the remedy and remand.

I.

A. Starbucks hired Whitbeck in 2019 to work as a barista at its Main and Liberty store in Ann Arbor, Michigan. Several weeks later, the company promoted her to shift supervisor. In that role, Whitbeck maintained "all the duties of a barista" and assumed the responsibility to "help[] guide the work of others and assist[] with ordering and accounting." J.A. at 977.

In January 2022, Whitbeck cofounded an effort to organize a union at her store. With the help of Workers United, a labor union, Whitbeck discussed among her colleagues what she

deemed to be the virtues of organizing, directing those interested to sign a union authorization card. Through these efforts, Whitbeck was widely viewed by her peers as the lead organizer at the Main and Liberty store.

Over the next two months, Whitbeck engaged in several visible measures to achieve her organizing ends. She emailed Starbucks's then–Chief Executive Officer, demanding that the company recognize Workers United as the Main and Liberty store's collective bargaining representative. She conducted a radio interview about the campaign. She began wearing union buttons in the café. She answered customer questions about unionizing. She appeared in a social media post supporting unionization. She placed union stickers in the store. And she wrote "Brewing Solidarity" on the store's "community board," a chalkboard open to messages from both Starbucks and the public.

In early March 2022, the Board held a videoconference hearing regarding Workers United's petition to represent employees at various Starbucks stores in the Ann Arbor area, including the Main and Liberty location. Although she did not participate, Whitbeck attended the hearing, with her name and picture visible. On that same video call for a brief period of time was Paige Schmehl, the Starbucks district manager overseeing about ten shops around Ann Arbor, including the Main and Liberty location. Schmehl noticed Whitbeck's attendance at the hearing. Schmehl and Erin Lind, the temporary manager of the Main and Liberty store, were also aware that store employees were organizing, including by their wearing union buttons at work. Shortly after the kickoff of that campaigning, Lind, at Schmehl's direction, posted two flyers at the Main and Liberty store. One expressed Starbucks's management's "sincere hope" that employees "w[ould] see" they do not need to unionize. *Id.* at 797. The other stated that the act of signing a union card "carries legal weight" and encouraged employees to "get all the facts!" before signing. *Id.* at 820.

To further its attempt to organize, Workers United scheduled "sip-ins" at two other Starbucks locations in Schmehl's district. At a March 20, 2022, sip-in at the Zweeb Street Starbucks location, a non-Starbucks-affiliated union supporter distributed union buttons and literature as well as Post-it notes for people to affix supportive messages on the store's community board. Note that Whitbeck did not work at that store and did not attend the sip-in.

But Schmehl sat in the store for the event's full three-hour duration, seemingly honoring the substitute store manager's request for "support" during the sip-in. Schmehl spoke to no one. But she did remove at least three notes from the community board for purportedly being inconsistent with company policy, which instructed that the board not include "[a]dvertisements," "[n]otices or [a]nnouncements that are political or religious in nature," "[n]otices that disparage Starbucks," or "[a]ny material that could be deemed offensive, insulting or derogatory." *Id.* at 945.

B. Amid these organizing efforts, an episode involving Whitbeck and her peers occurred at the Main and Liberty store. At the start of her shift on February 27, 2022, Whitbeck messaged Lind that multiple baristas had complained about working with B.G., another shift supervisor at the Main and Liberty store, with co-equal authority to Whitbeck's. Whitbeck then wrote in the daily book, where employees document store incidents, that she "[d]id nothing like always ☺." *Id.* at 920. That notation was an apparent sarcastic reference to B.G.'s alleged remarks that Whitbeck "never does anything" at work. *Id.* at 185. When B.G. arrived for his shift at 3:00 p.m., he read this entry and, in turn, criticized Whitbeck for acting unprofessionally. As they argued, B.G. asked a nearby coworker if she knew how much "shit [Whitbeck] talk[ed]" about her. *Id.* at 375. Afterward, B.G. and Whitbeck stopped speaking for several hours.

That day, Whitbeck was scheduled to work until 7:00 p.m. with B.G. and Lucien Meloche, a barista, both scheduled to work until 10:30 p.m. B.G. was also scheduled to take a thirty-minute break—from 6:45 p.m. to 7:15 p.m.—meaning Meloche would be working alone if B.G. was not there when Whitbeck left the store at the end of her shift. Starbucks's corporate policy, however, required at least two employees to be present in an open café (the "two-employee rule"). The rule was designed to protect employee safety, a particular concern for "high incident" stores like the Main and Liberty location, which averaged roughly two to three occasions of customer violence or related issues each week. So when only two employees are working and one has a scheduled break, the policy explained, the on-break employee must remain in the store, receiving compensation for the break's duration.

Whitbeck's grandfather reportedly had suffered a heart attack earlier that day, and she intended to visit him immediately after her shift ended at 7:00 p.m. So, she asked B.G. to take his break early. But B.G. refused and instead began his break shortly before 7:00 p.m. Whitbeck

nevertheless exited the store at the end of her shift, leaving just Meloche on the premises. Though Whitbeck did not contact her supervisors to alert them that Meloche would be alone in the store or to request support, she texted Lind at 6:55 p.m. to complain about the earlier incident with B.G. Whitbeck later texted Meloche to confirm whether B.G. had returned. According to Meloche, B.G. returned close to 7:30 p.m. In the interim, one customer entered the café.

The next day, Whitbeck submitted a written incident report, primarily about her verbal altercation with B.G. In her report, Whitbeck admitted to leaving Meloche alone, but explained that "[she] would have stayed if [she] could but there was something serious [she] needed to get to after work." *Id.* at 803. Lind met with Whitbeck that day to discuss the report. Lind did not probe further into why Whitbeck could not work past 7:00 p.m., and Whitbeck gave no more details on the topic. Per Starbucks policy, Lind updated Schmehl about the two incidents revealed in Whitbeck's report (i.e., the verbal altercation and the violation of the two-employee rule). Lind also spoke with B.G. about the incidents, later receiving a written statement from him.

These events prompted Schmehl and Lind to contact Starbucks's human resources department. Lind consulted the department regarding the incident. Schmehl, for her part, forwarded B.G.'s statement to the department, and later engaged with the department on disciplinary options for Whitbeck and B.G. Schmehl also sought a statement from Meloche, which she received on March 20, the same day as the "sip-in" described earlier. The next day, Schmehl decided to terminate employment for both B.G. and Whitbeck, which the legal department approved on April 3. According to her notice-of-separation letter received on April 11, Whitbeck was fired for "fail[ing] to communicate in line with Starbucks [sic] mission and values and fail[ing] to meet expectations in [her shift supervisor] role" during the night of her run-in with B.G. *Id.* at 816. By contrast, B.G. was fired on April 14 for saying the word "shit" in a customer-facing area of the store. *Id.* at 818.

C. On Whitbeck's behalf, Workers United pursued unfair-labor-practice charges against Starbucks. The primary charge, filed with the Board on April 11, claimed that Starbucks unlawfully terminated Whitbeck to stifle organizing efforts. The Board in turn filed a consolidated complaint alleging that Starbucks violated the NLRA by discharging Whitbeck in

purported retaliation for her union activity, her participation in a Board hearing, and Workers United's filing of a prior charge regarding Whitbeck.

Starbucks denied the claims. The company maintained that Whitbeck was permissibly terminated for violating Starbucks's two-employee rule and failing to request coverage from supervisors. But the ALJ, and a three-member majority of the Board on appeal, disagreed. To their minds, Whitbeck showed sufficient "union animus" by her supervisors to satisfy the retaliation claim. *Starbucks Corp.*, 372 NLRB No. 122, slip op. at 4–5, 21. As a remedy, the Board ordered Starbucks to, among a laundry list of other directives, "[m]ake . . . Whitbeck whole for any loss of earnings and other benefits, and for any other direct or foreseeable pecuniary harms, suffered as a result of the discrimination against her." *Id.* at 5. The "myriad" components of such "direct or foreseeable pecuniary harms" can include interest and late fees on credit cards, penalties on early withdrawals from retirement accounts, and the loss of a car or home from missed loan or mortgage payments. *Thryv, Inc.*, 372 NLRB No. 22, slip op. at 9, 2022 WL 17974951 (Dec. 13, 2022) (quoting *Voorhees Care & Rehab. Ctr.*, 371 NLRB No. 22, slip op. at 4 n.14, 2021 WL 3812220 (Aug. 25, 2021)). Such capacious relief, the Board explains, "is necessary to more fully effectuate the make-whole purposes of the [NLRA]." *Id.* at 7.

Starbucks now seeks denial or vacatur of the Board's order for two reasons: The Board's unfair-labor-practice determination lacks substantial evidence; and the Board's award of all "direct or foreseeable pecuniary harms," besides lost earnings and benefits, exceeds its remedial authority provided in § 10(c) of the NLRA.

## II.

We begin with the substantial evidence challenge. At its core, the NLRA prohibits employers from firing employees based on their union-related activity. *See* 29 U.S.C. § 158(a). A burden-shifting process frames the statutory inquiry. At the outset, the Board must show that "anti-union animus" motivated Whitbeck's discharge. *Birch Run Welding & Fabricating, Inc. v. NLRB*, 761 F.2d 1175, 1179 (6th Cir. 1985). If it does, the burden shifts to Starbucks to show that Whitbeck would have been fired even if she had not engaged in protected activity. *Id.*

Through it all, we ask only whether "the record considered as a whole" supports the Board's factual conclusions on these fronts "by substantial evidence." 29 U.S.C. § 160(e). Substantial evidence exists when "the record viewed as a whole provides sufficient evidence for a reasonable factfinder to reach the conclusions the Board has reached." *NLRB v. Galicks, Inc.*, 671 F.3d 602, 607 (6th Cir. 2012) (citation omitted).

A. Beginning with the threshold inquiry, our task is to consider whether substantial evidence supports the Board's conclusion that anti-union animus motivated Starbucks's conduct. *Birch Run Welding & Fabricating, Inc.*, 761 F.2d at 1179. To meet that standard, the Board must make three showings: Whitbeck engaged in protected activity; Starbucks knew of that protected activity; and Starbucks acted "on the basis of anti-union animus." *FiveCAP, Inc. v. NLRB*, 294 F.3d 768, 777 (6th Cir. 2002). Here, only the last factor—whether Starbucks acted out of anti-union animus—is at issue. On that point, the ALJ agreed with the union's assertion of animus on Starbucks's part, a determination (along with its associated factual findings) later adopted by the Board. Substantial evidence supports that conclusion.

*Disparate Treatment.* In assessing whether anti-union animus guided the discharge, we may consider whether there are any relevant comparators to Whitbeck. Circumstantial evidence of animus includes "disparate treatment of certain employees compared to other employees with similar work records or offenses." *W.F. Bolin Co. v. NLRB*, 70 F.3d 863, 871 (6th Cir. 1995). Here, several pieces of evidence indicate that termination was not the anticipated or common penalty for this infraction, and that at least one other employee engaged in the same conduct as Whitbeck but did not have their employment terminated as a result.

Consider first that just two years earlier another shift supervisor at the Main and Liberty store, Adam Hess, received a final warning (but was not terminated) for violating the two-employee rule at least twice and for "putting his hands on people's shoulders to move them out of the way." J.A. at 264. Indeed, it was only months later that Hess, after continuing to break the two-employee rule and repeatedly making inappropriate comments in the café, had his employment terminated. Contrast that chain of events to those involving Whitbeck, who was fired after she violated the two-employee policy just once even though she lacked any disciplinary history and appears to have been a model employee. That type of "disparate

treatment" can reflect anti-union animus. *See, e.g.*, *Airgas USA, LLC v. NLRB*, 916 F.3d 555, 565 (6th Cir. 2019); *NLRB v. Main St. Terrace Care Ctr.*, 218 F.3d 531, 542 (6th Cir. 2000).

Starbucks raises several counterpoints to undermine the probative value of this evidence. None are convincing. For instance, Starbucks maintains that Hess's violations stemmed from a "job aid" concerning entering a store alone, which Starbucks says triggers "different risks" to employees and customers than leaving an open café to a single barista, as Whitbeck did. Perhaps. But perhaps not. Starbucks, we note, does not explain how those risks differ. Nor does this seem to be an obvious conclusion to draw, when each action still results in an employee working alone, unable to receive help from a coworker should a safety concern arise. Whether that employee had entered the store alone, or simply remained in the store while the last on-duty coworker left, seemingly is irrelevant. Indeed, the job aid appears to be a red herring, as Starbucks purports to treat the document as merely complementary to more authoritative guidance providing that corrective action depends on the infraction's seriousness and surrounding circumstances. And we fail to see how Hess's multiple violations were any less serious than Whitbeck's. True, as Starbucks notes, Whitbeck's violation of the two-employee rule occurred at night and in a "high incident" store. But Starbucks's disciplinary guidance provides no escalating penalties for such geographic or temporal nuances.

Starbucks next maintains that Whitbeck committed an "aggravated violation" of the two-employee rule. Despite knowing her departure violated corporate policy, the company explains, Whitbeck did not timely inform any supervisor that Meloche remained in the store by himself. That failure, says Starbucks, foreclosed any opportunity for the company to adequately safeguard the store, thereby justifying Whitbeck's discharge. It may be the case, as Starbucks contends, that the company could have responded during the 30-minute period when Meloche worked alone. Yet that point glosses over the counterpoints. One is that the policy expressly anticipated a violation of the two-employee rule and specified that the appropriate discipline was a warning, without any suggestion that there are differing degrees of the violation, such as "aggravating circumstances." But even accepting Starbucks's assertion that "aggravating circumstances," such as Whitbeck's noncommunication, "warrant[] immediate dismissal," Starbucks Br. 27, over six weeks passed between when Whitbeck admitted to her infraction and her eventual discharge.

During that time, Starbucks did not suspend Whitbeck, demote her, or reduce her hours at all—despite this alleged urgency to fire her. Whitbeck remained in her shift-supervisor role, at her same weekly hours, for six full weeks. And then there is the comparison to Hess, who twice failed to disclose his violation of the two-employee policy to management yet received only a final written warning, continuing to work at the Main and Liberty store for months thereafter. Looking to comparators more broadly, Starbucks highlights "five to ten" instances where Schmehl terminated employees without disciplinary history for violating "safety and security policies." But the record sheds no further light on these alleged analogues, in particular, whether they concerned a similar violation of the two-employee policy. In fact, Schmehl testified that she was "not aware of anyone that's ever been a discipline [sic] for leaving a barista alone in a store."

No more availing is Starbucks's attempt to analogize Whitbeck and B.G. Notwithstanding that Starbucks discharged both employees in the middle of April 2022, the fact remains that B.G. was fired for the distinct reason of "us[ing] profanity in front of house," J.A. at 818, and nothing in the record specifies how the company's discipline for this infraction stacks up against that for violating the two-employee rule. Just because these terminations concerned "conduct that occurred on the same day and involved both" B.G. and Whitbeck, Starbucks Br. 29, in other words, does not mean the two automatically form apt comparators. Nor does the ALJ's finding that B.G. had a reputation for holding "anti-union views" change our thinking. J.A. at 458. In some cases, that fact may be relevant in discrediting an employer's purported animus. But here, one could just as well conclude that Starbucks was unlawfully heavy-handed with Whitbeck while still willing to discipline anti-union employees when warranted. In short, the issue does not cut decisively in either direction.

That said, the Board's comparator evidence is not without flaws. Case in point is the Board's reliance on Starbucks's job-aid guidance, which arguably suggested that Whitbeck should receive a punishment less than termination due to her leaving Meloche alone in the café. The Board concluded that Starbucks's decision to terminate Whitbeck was at odds with the instructions in the job aid, thereby reflecting anti-union animus. But that document does not stand alone with respect to company disciplinary procedures. Rather, by its own terms, the job

aid merely "complement[s]" other binding guidance. *Id.* at 847. Looking more broadly, Starbucks's employee-resources manual clarifies the possibility of immediate discharge "[i]n cases of serious misconduct," *id.* at 966, and the Board's comparator evidence centers on just one similarly situated employee. But on the whole, the Board supported its order using more than an inference of disparate treatment. And considering Starbucks's failure to articulate the probative value of the job aid as well as the lack of discipline for Hess's repeated misconduct, this comparator evidence supports the Board's conclusion.

*Timing.* Close "proximity in time between the employees' union activities and their [discipline]" can be relevant in assessing animus. *W.F. Bolin*, 70 F.3d at 871. Whitbeck was terminated on April 11, despite her violations occurring in late February. In the lead up to Whitbeck's termination, several material events occurred. Seventeen days before Schmehl recommended termination, she joined the videoconference hearing on Workers United's petition and noticed Whitbeck's attendance. A day before that recommendation, Schmehl attended the "sip-in" at the Zweeb Street store, detailed earlier. And at least five days before Starbucks's legal department approved Schmehl's decision, it learned about Workers United's first unfair labor practice charge filed on Whitbeck's behalf. While none of these events on its own is especially indicative of anti-union animus, each timespan roughly lands within the realm of temporal proximity we have previously deemed suggestive of anti-union animus. *See, e.g.*, *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 756 (6th Cir. 2012) (deeming two-week gap between protected activity and discharge probative of anti-union animus); *NLRB v. Roemer Indus., Inc.*, 824 F. App'x 396, 405 (6th Cir. 2020) (same). Taking these events together thus raises at least a suspicion of improper conduct by Starbucks.

Starbucks counters by asserting that the Board overlooked critical context behind each incident. With respect to the six-week interim between Whitbeck's misconduct and discharge, for example, Starbucks explains that it simply needed time to properly investigate the incident. As to the "sip-in," while it occurred a day before Whitbeck's discharge, Starbucks notes that Whitbeck did not attend that event, nor did it take place at the Main and Liberty store. And as to the filing of Workers United's first charge, Schmehl had already recommended Whitbeck's termination at that point. A more relevant timing consideration, says Starbucks, is that Schmehl

recommended termination one day after receiving Meloche's statement (which, recall, happened on the same day as the "sip-in"), and that Starbucks fired B.G. shortly thereafter for his misconduct on the day of the altercation.

While lending credence to Starbucks's position, these considerations have their caveats, especially in light of our deference to the Board's credibility determinations. *See, e.g., Galicks*, 671 F.3d at 607. Although Schmehl processed Whitbeck's termination unaware of the Workers United charge, Starbucks's legal department—aware of the then-ongoing labor proceedings—consulted with Schmehl twice and gave its requisite approval to the discharge. Likewise, the lack of a direct tie between Whitbeck and the "sip-in" does not foreclose the possibility that the latter affected the former's employment. Considering that Workers United filed petitions to represent both the Zweeb Street store where the "sip-in" occurred as well as the Main and Liberty location, Schmehl could have intended to impede key actors like Whitbeck in the broader organizing campaign after witnessing the campaign's scale. As to Meloche's statement, it consisted merely of a phone call in which he recounted "hearing about the break situation from [Whitbeck]," J.A. at 999, and a ninety-one-word text message explaining how Whitbeck "left [him] alone at the store," *id.* at 812. Neither comment gave Starbucks new details about Whitbeck's misconduct that she had admitted to a month earlier, let alone details damning enough to warrant her termination a day later. Finally, the delayed discipline for B.G.'s one-time use of profanity around customers sheds little light on Starbucks's reasoning for postponing Whitbeck's discharge after she, again, admitted to a policy violation that, in the company's words, "warranted immediate dismissal." Starbucks Br. 27. In the end, while it may be merely coincidental that Starbucks fired Whitbeck during or shortly after her protected activity, this record evidence helps support the Board's conclusion.

*General Anti-Union Animus.* Lastly, consider Starbucks's purported general animus toward Workers United in tandem with its knowledge of Whitbeck's organizing efforts. "[E]xpressed hostility towards unionization combined with knowledge of the employees' union activities" can support a Board's animus finding. *W.F. Bolin*, 70 F.3d at 871. The record contains one incident evidencing such hostility: the "sip-in." Recall, Schmehl attended the demonstration for its full three-hour duration. Although Schmehl's attendance was prompted by

a substitute store manager's request for support, two aspects of that visit raise modest suspicions. One, Schmehl did not speak with a single employee, a seemingly odd tack for a visiting district manager. Indeed, as Schmehl testified, when visiting other stores for upwards of three hours, she would do so to, for instance, review the "plan for the next promotional period" with the respective store manager. J.A. at 650. Two, Schmehl repeatedly removed pro-union notes from a community board, a responsibility that might more squarely fall within the job descriptions of lower-level employees, including the store manager who had attended the same "sip-in." *See id.* at 977 ("The store manager is ultimately in charge of all store operations . . . ."). Taken together, this conduct could suggest a general hostility toward Workers United's organizing efforts, of which Schmehl knew Whitbeck was a supporter.

Starbucks offers a host of retorts. We agree, as Starbucks observes, that the Board cannot support its animus determination based solely on a perception of general hostility toward unionizing. Rather, the Board must make a "particularized showing" that the employer acted with animus toward the employee. *FiveCAP*, 294 F.3d at 781. But as already discussed, the Board supplemented its analysis of the "sip-in" with other indications of animus—all of which were tailored to Whitbeck. No further availing are Starbucks's assertions that Schmehl acted lawfully and followed company policy in removing the pro-union notes. Like Starbucks's observations that it had a right to legally monitor non-employee union activity, *see Oakwood Hosp. v. NLRB*, 983 F.2d 698, 703 (6th Cir. 1993) (noting an employer's general right to observe non-employee union organizers), and that Schmehl and Lind might not have known that Whitbeck served as a lead union organizer, Starbucks's private-bulletin-board policy is beside the point. Schmehl acted in a way at odds with her ordinary district-manager responsibilities when attending the demonstration and was at the same time aware of Whitbeck's open support for the organizing union. Those facts, coupled with the others discussed, render the Board's analysis in accord with our precedent.

B. Because the Board has established its prima facie case, the burden shifts to Starbucks "to prove that it would have made the same employment decision regardless" of Whitbeck's union activity. *Ctr. Constr. Co. v. NLRB*, 482 F.3d 425, 435 (6th Cir. 2007). "Simply showing

that the evidence supports an alternative story is not enough." *Galicks*, 671 F.3d at 608. Rather, Starbucks "must show that the Board's story is unreasonable." *Id.*

Starbucks believes that is the case for two reasons. First, according to the company, the Board ignored that Whitbeck was fired for violating the two-employee rule as well as failing to communicate a need for coverage in the Main and Liberty location. Second, the Board purportedly ignored evidence that other employees had been fired for violating Starbucks's safety policies, even when they lacked any disciplinary history.

Both retorts should sound familiar. After all, they parallel Starbucks's counterarguments to its alleged disparate treatment of Whitbeck, points we have already rejected. As before, Starbucks fails to reconcile Whitbeck's discharge with the conflicting guidance in its job aid, and its mere warning of Hess despite his multiple uncommunicated violations of the two-employee rule. Other than a vague description of Schmehl's immediate terminations of other employees who breached "safety and security policies," Starbucks offers little more to prove that its purported analogues committed offenses comparable to Whitbeck's. Again, the lone comparator with sufficient specification in the record—B.G.—was discharged for the distinct reason of using an expletive in a customer-facing area of the store. In short, the Board had sufficient evidence to conclude that Starbucks failed to prove an affirmative defense.

C. No silver bullet decisively establishes Starbucks's improper motive in discharging Whitbeck. But under our precedent, it is enough that, taking the record as a whole, substantial evidence supports the Board's prima facie case and defeats the company's affirmative defenses. The findings here clear that threshold. Starbucks terminated Whitbeck while aware of her organizing efforts. And during the ensuing administrative proceedings, Starbucks failed to undermine an assortment of signals indicating Whitbeck's discharge was fueled, at least in part, by anti-union animus. Even if none of those signals standing alone would suffice for us to affirm the Board's decision, that is not the test. Evaluating, as we must, whether substantial evidence supports the Board, we agree that it does.

III.

That brings us to the remedy. Once the Board identifies an unfair labor practice, § 10(c) of the NLRA authorizes the Board to order the employer to "cease and desist" from that practice and to "take such affirmative action, including reinstatement of employees with or without back pay, as will effectuate the policies of th[e] [NLRA.]" National Labor Relations Act, ch. 372, § 10(c), 49 Stat. 449, 454 (1935) (codified as amended at 29 U.S.C. § 160(c)). Although that statutory language has been in place since 1935, the Board recently gave the latter clause new meaning. Specifically, the Board now reads the phrase "affirmative action" to authorize it to compensate "affected employees for all direct or foreseeable pecuniary harms suffered as a result of the [employer's] unfair labor practice." *Thryv, Inc.*, 372 NLRB No. 22, slip op. at 13. Applying this so-called *Thryv* remedy here, the Board ordered Starbucks to make "Whitbeck whole for . . . any other direct or foreseeable pecuniary harms[] suffered as a result of the discrimination against her." *Starbucks Corp.*, 372 NLRB No. 122, slip op. at 5.

If that latter remedy sounds capacious, it should. In *Thryv*, three members of the Board (over a two-member dissent) "revisit[ed] and clarif[ied] [its] existing practice of ordering relief" for unlawful conduct. *Thryv*, 372 NLRB No. 22, slip op. at 6. In particular, the Board located newfound, categorical authority to "order respondents to compensate affected employees for all direct or foreseeable pecuniary harms." *Id.* at 1. It arrived at that conclusion both from its reading of § 10(c)'s text and by pointing to a handful of the Board's past cases that, in its view, awarded relief beyond just backpay and reinstatement. *Id.* at 7–11. Having done so, the Board then crafted a "myriad of other possible examples" of direct or foreseeable harms: childcare costs, transportation expenses, credit card debt (including interest and late fees thereof), penalties on early withdrawals from retirement accounts, and the loss of a car or home from missed loan and mortgage payments. *Id.* at 9 (quoting *Voorhees Care & Rehab. Ctr.*, 371 NLRB No. 22, slip op. at 4 n.14). The Board added that it would be ordering the same relief "in all cases in which [its] standard remedy would include an order for make-whole relief," *id.* at 13, a practice it maintains to date—including here, *Starbucks*, 372 NLRB No. 122, slip op. at 1 n.3. Not even contrary circuit decisions would dissuade the Board from pursuing its refashioned approach, save for where binding precedent unquestionably forecloses it from doing so. *See Airgas USA, LLC*,

373 NLRB No. 102, slip op. at 1 n.2, 2024 WL 4251820 (Sept. 18, 2024) (clarifying the Board will continue applying *Thryv* in future orders, even if it receives adverse decisions from Circuit Courts).

A. Understanding the Board's remedial authority to be equitable and not legal in nature, Starbucks disagrees that the agency's statutory authority to take "affirmative action" to remedy NLRA violations encompasses the power to award broad monetary relief envisioned under *Thryv*. Before reaching the merits of that claim, however, we must first address a threshold issue: forfeiture. "No objection that has not been urged before the Board, its member, agent, or agency," the NLRA says, "shall be considered by the [federal] court [of appeals], unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e). As the Board sees things, Starbucks forfeited its various challenges to § 10(c)'s scope by failing to raise them before the Board.

Not so. During the underlying administrative proceeding, Starbucks repeatedly challenged the Board's authority to award legal relief under § 10(c). In the Board's own words, the employer "attacked the *Thryv* remedy." NLRB Br. 50. For example, Starbucks criticized the Board's recent awards of foreseeable damages as involving "not an equitable concept but instead a legal principle typically preserved for juries in court." NLRB Supp. App. 32. Starbucks argued that the Board "does not have authority to create or award additional types of compensatory relief," and, further, that "if the [NLRA] is going to be expanded to include consequential damages, or any other form of pecuniary harm beyond that specified by the Act, that is a decision for Congress to make." *Id.* at 34. And, on top of that, Starbucks "reserve[d] the right to challenge the Board's decision in *Thryv*," including that the Board "lacks authority" to award consequential damages, "through subsequent court review." *Id.* at 33. All of this fairly "apprise[d] the Board of" Starbucks's "intention to bring up the question" of permissible remedies on appeal. *UAW v. NLRB*, 844 F.3d 590, 598 (6th Cir. 2016) (citation modified). That alone suffices to defeat any invocation of our forfeiture doctrine. *Id.*; *see also NLRB v. Metro Man IV, LLC*, 113 F.4th 692, 700 n.2 (6th Cir. 2024) (rejecting forfeiture argument because respondent raised "the general issue . . . squarely before the Board").

B. With this procedural prelude aside, turn to the merits. We review de novo the Board's legal conclusions, including its interpretation of § 10(c). *See Rieth-Riley Constr. Co. v. NLRB*, 114 F.4th 519, 528 (6th Cir. 2024) (citing *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2262 (2024)). Again, § 10(c) requires the Board to order employers "to cease and desist" from identified unfair labor practices and "to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate" the policies of the NLRA. 29 U.S.C. § 160(c). The question before us is whether Congress used "affirmative action" as a phrase of art referring only to equitable remedies, as Starbucks urges, or instead as a literal phrase encompassing all types of relief, including those legal in nature, as the Board suggests. To our minds, all signs point to the former.

1. In interpretating a statute, we begin, as always, with its text. *Hardt v. Reliance Standard Life Ins.*, 560 U.S. 242, 251 (2010). Here, two words in § 10(c) warrant emphasis: "affirmative action." Standing alone, the terms "affirmative" and "action," as defined by lay and law dictionaries contemporary to the NLRA's 1935 enactment, have somewhat imprecise meaning. *See, e.g.*, *Affirmative*, 1 *Oxford English Dictionary* 157–58 (1st ed. 1933) ("Strengthening, corroborative; confirmatory."); *Action*, *id.* at 93 ("The process or condition of acting or doing (in the widest sense), the exertion of energy or influence; working, agency, operation."); *Affirmative*, *Black's Law Dictionary* 75 (3d ed. 1933) ("That which declares positively; that which avers a fact to be true; that which establishes; the opposite of negative."); *Action*, *id.* at 41 ("Conduct; behavior; something done; the condition of acting; an act or series of acts."). But when paired together, these words take on a more concrete effect: They limit the realm of possible remedies to those primarily equitable in nature. *See, e.g.*, John F. Manning, *The Absurdity Doctrine*, 116 Harv. L. Rev. 2387, 2393 (2003) ("[L]iteral or dictionary definitions of words will often fail to account for settled nuances or background conventions that qualify the literal meaning of language and, in particular, of legal language.").

That observation prompts a few words on equitable relief. At a high level, equity refers to the remedies, procedures, and practices developed in and evolved from English courts of equity, particularly the Court of Chancery. *See Cleveland v. Second Nat. Bank & Tr. Co.*, 149 F.2d 466, 469 (6th Cir. 1945). It usually functions *in personam* rather than *in rem*, such that

equity courts provide relief by directing an individual to perform an act concerning the property at issue. *Int'l Union, United Mine Workers v. Bagwell*, 512 U.S. 821, 841 (1994) (Scalia, J., concurring). This manner of relief includes, for instance, ordering a party "to cease and desist" from a particular course of conduct. *S. Pac. Terminal Co. v. Interstate Com. Comm'n*, 219 U.S. 498, 499 (1911). Even after the merger of law and equity in federal courts, *see* Fed. R. Civ. P. 2, we have preserved much of the separation between these two systems, *see, e.g.*, *Chauffeurs, Teamsters & Helpers, Loc. No. 391 v. Terry*, 494 U.S. 558, 565 (1990) (right to a jury trial). Remedies in particular remain as one of the "principal differences." *Missouri v. Jenkins*, 515 U.S. 70, 127 (1995) (Thomas, J., concurring).

With these background principles in mind, return now to the early twentieth-century understanding of the phrase "affirmative action." *See Loper Bright*, 144 S. Ct. 2266 ("[E]very statute's meaning is fixed at the time of enactment." (citation modified)). The phrase "affirmative action" was routinely tied to equitable power. Decades before the NLRA's enactment, the Supreme Court recognized that a "court of equity" wields the "power" to "require affirmative action." *In re Lennon*, 166 U.S. 548, 556 (1897); *see also Federal Republic of Germany v. Philipp*, 141 S. Ct. 703, 712 (2021) (consulting "legal and historical backdrop" to interpret federal statute). This same understanding populated the era of the NLRA's enactment, with federal courts describing equity's core effect as restraining or compelling "affirmative action." *See, e.g.*, *Mut. Oil Co. v. Empire Petroleum Co.*, 5 F.2d 500, 500 (6th Cir. 1925) (per curiam) (explaining equitable relief may "require[e] affirmative action"); *Vaughan v. John C. Winston Co.*, 83 F.2d 370, 374 (10th Cir. 1936) ("The power of equity, in an injunctive action, to issue an order requiring affirmative action is frequently and properly exercised."). So too in the state courts, where jurisdictions around the country similarly used the phrase "affirmative action" to describe the effect and function of equitable remedies as well as a limited slate of extraordinary legal relief, such as mandamus. Consider examples from the Northeast, *Dep't of Pub. Utils. v. Trs. of Props. of N.Y., N.H. & H.R. Co.*, 24 N.E.2d 647, 651 (Mass. 1939) (explaining that "an order compelling affirmative action" is usually associated with "equity"); the South, *Williams v. Shaver*, 140 S.W. 740, 742 (Ark. 1911) ("[E]quity will grant relief by injunctive or affirmative action . . . ."); and the Midwest, *Portmann v. Bd. of Elections*, 19 N.E.2d 531, 533 (Ohio Ct. App. 1938) ("An injunction will lie not only to prevent a

contemplated wrong where there is no adequate remedy at law, but to require affirmative action . . . .").

Prominent legal scholars both then and now share the same view. They likewise describe "affirmative action" as authorizing relief that is equitable in nature. *E.g.*, 1 John Norton Pomeroy, *A Treatise on Equity Jurisprudence* § 381, at 632 (3d ed. 1905) (describing how "a court of equity will never, by its affirmative action, . . . enforce a penalty or forfeiture"); Roscoe Pound, *The Progress of the Law, 1918–1919: Equity*, 33 Harv. L. Rev. 420, 439 (1920) (referring to "the power of equity to coerce affirmative action"); Samuel L. Bray, *The System of Equitable Remedies*, 63 UCLA L. Rev. 530, 553 (2016) (explaining how courts typically "compel action or inaction . . . by means of an equitable remedy"). In short, courts and commentators alike have long employed the phrase "affirmative action" to refer to the effect or function of equitable relief.

Consistent with this shared understanding, the Board's authority under § 10(c) to order employers to take "affirmative action" encompasses only equitable remedies. That phrase has a well-established meaning associated with the function or effect of traditional equitable remedies. And "where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word." *Morissette v. United States*, 342 U.S. 246, 263 (1952). Our conclusion, we note, aligns with the Supreme Court's NLRA-related recognition that "Congress did not establish a general scheme authorizing the Board to award full compensatory damages for injuries caused by wrongful conduct." *Int'l Union, UAW v. Russell*, 356 U.S. 634, 643 (1958). Rather, "[t]he power to order affirmative relief under § 10(c) is merely incidental to the primary purpose of Congress to stop and to prevent unfair labor practices." *Id.* at 642–43. It also comports with the Third and Fifth Circuits' assessment of the issue. *NLRB v. Starbucks Corp.*, 125 F.4th 78, 95 (3d Cir. 2024) ("The NLRA therefore limits the Board's remedial authority to equitable, not legal, relief."); *Hiran Mgmt., Inc. v. NLRB*, --- F.4th ---, 2025 WL 3041862, at *6 (5th Cir. Oct. 31, 2025); *see also Int'l Union of Operating Eng'rs, Stationary Eng'rs, Loc. 39 v. NLRB*, --- F.4th ---, 2025 WL 2963359, at *24 (9th Cir. Oct. 20, 2025)

(Bumatay, J., dissenting in part) (concluding the same); *3484, Inc. v. NLRB*, 137 F.4th 1093, 1125 (10th Cir. 2025) (Eid, J., concurring in part and dissenting in part) (same).

2. While the foregoing textual analysis is sufficient on its own to resolve the question in Starbucks's favor, a host of other considerations lead to the same conclusion. One is the structure of § 10, which further confirms the equitable nature of "affirmative action." Begin with the fact that Congress, in the NLRA, did not make the Board's remedial orders self-executing. Rather, federal appellate courts must enter a "decree enforcing, modifying and enforcing as so modified, or setting aside in whole or in part the order of the Board." 29 U.S.C. § 160(e). That courts may tailor the Board's orders comports with, in the words of Judge Friendly, the "long-established, broad, and flexible" "power of a court of equity to modify a decree." *N.Y. State Ass'n for Retarded Child., Inc. v. Carey*, 706 F.2d 956, 967 (2d Cir. 1983) (Friendly, J.). Likewise, the Board's power to hold unlawful actors in contempt to coerce compliance with its orders, *see Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 152 (2002), reflects the paradigmatic enforcement tool of a court sitting in equity, *see Brandon v. Holt*, 469 U.S. 464, 476 (1985) (Rehnquist, J., dissenting). Like other statutory phrases, the meaning of "affirmative action" is "known by the company it keeps." *Dubin v. United States*, 143 S. Ct. 1557, 1569 (2023) (citation modified).

Consider yet one more feature of the NLRA's remedial provision. By way of background, Congress, when bestowing federal courts with the power to award damages remedies, ordinarily does so only with express limits. *E.g.*, 42 U.S.C. § 1981a(b)(3) (establishing cascading series of damages for certain Title VII claims); 28 U.S.C. § 2674 (barring interest and punitive damages for lawsuits under the Federal Tort Claims Act); 17 U.S.C. § 504(a)–(c) (limiting recovery for copyright infringement to either statutory damages or actual damages and profits). That the NLRA nowhere specifies monetary relief is thus a strong indicator that Congress did not design the Act to empower the Board with such legal remedial power. *See* 29 U.S.C. §§ 151–169. Again, the only remedies enumerated in § 10(c)—reinstatement and backpay—land clearly in equity. *Fleming v. Ayers & Assocs.*, 948 F.2d 993, 998 (6th Cir. 1991) ("[R]einstatement is an equitable remedy . . . ."); *Curtis v. Loether*, 415 U.S. 189, 197 (1974) ("In Title VII cases the courts of appeals have characterized back pay as an

integral part of an equitable remedy[] . . . ."). As Judge Eid recently observed, "the fact that the NLRA only expressly grants the Board authority to award those two equitable remedies sheds light on what other types of relief the Board may award." *3484*, 137 F.4th at 1125 (Eid, J., concurring in part and dissenting in part).

Indeed, if "affirmative action" captured the expansive remedies the Board defends here, then another portion of § 10(c) would be plainly inconsistent and make little sense. In adding an exception for employees "suspended or discharged for cause," the statute says the Board may not award such employees "reinstatement or backpay." 29 U.S.C. § 160(c). As these are the remedies expressly listed in § 10(c), one could fairly read this prohibition as completely limiting the relief allowable to an employee reprimanded for cause. Yet under the Board's reading, those same ne'er-do-well employees could still receive relief, and rather significant relief at that, in the form of other direct or foreseeable harms suffered, because the exception says only "reinstatement and backpay." We ordinarily interpret statutes to avoid such "anomalous results." *Cortez Byrd Chips, Inc. v. Bill Harbert Constr. Co.*, 529 U.S. 193, 202 (2000).

3. Consider also related statutes. Roughly three decades after the NLRA's adoption, Congress enacted Title VII. *See* Civil Rights Act of 1964, Pub. L. No. 88-352, §§ 701–718, 78 Stat. 241, 253–66 (codified as amended at 42 U.S.C. §§ 2000e to 2000e-17). In so doing, legislators "expressly modeled" the law's remedial provision, § 706(g), after § 10(c). *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 419 (1975). Section 10(c) thus "gives us guidance as to the proper meaning of the same language in [§ 706(g)] of Title VII." *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 849 (2001). The opposite is true as well, given future developments with Title VII. To that end, in 1972, Congress amended § 706(g) to authorize courts to "order such affirmative action as may be appropriate, which may include . . . reinstatement . . . with or without back pay . . . *or any other equitable relief* as the court deems appropriate." Equal Employment Opportunity Act of 1972, Pub. L. No. 92-261, § 4(a), 86 Stat. 103, 107 (codified as amended at 42 U.S.C. § 2000e-5(g)(1)) (emphasis added). That phrasing further confirms our understanding of "affirmative action." If Congress intended "affirmative action" to also encompass legal relief, it would make little sense to follow that term

with the language "or any other equitable relief." It would be akin to a grocery list that prompts purchases of "apples, bananas, or any other vegetable."

Section 706(g) sends even more signals as to § 10(c)'s limited scope. One, as the Supreme Court has held, § 706(g), as amended in 1972, provides no authority for compensatory damages. *United States v. Burke*, 504 U.S. 229, 238 (1992). With § 706(g) "expressly modeled" after § 10(c), *Albemarle Paper Co.*, 422 U.S. at 419, the same should be true for the NLRA. Two, Congress later amended Title VII to expressly permit such compensatory remedies—following a jury trial—in certain contexts. *See* Civil Rights Act of 1991, Pub. L. No. 102-166, § 102, 105 Stat. 1071, 1073 (codified as amended at 42 U.S.C. § 1981a(c)). Lawmakers could do the same for § 10(c). But, at least so far, they have not.

4. The scales tip even further when we broaden our inquiry to parallel state laws. Examples abound of state antidiscrimination statutes that, like § 706(g), expressly denote "affirmative action" as equitable in nature. *E.g.*, Ariz. Rev. Stat. Ann. § 41-1481(G) (permitting courts to remedy unlawful discrimination by ordering "affirmative action," including "reinstatement" with or without backpay and "any other equitable relief"); Haw. Rev. Stat. § 378-5(b) (same); Iowa Code § 70A.29(3)(a) (same); S.C. Code Ann. § 1-13-90(d)(9) (same); Conn. Gen. Stat. § 31-40aa(j)(2) (same, adding that "compensatory and punitive damages" are available only if employer acted "with malice or with reckless indifference").

To the same end, where state law's reach has been left for court interpretation, state courts have long read "affirmative action" in their state antidiscrimination statutes to refer only to equitable relief. That is the case even when, as in § 10(c), the statutory text does not expressly state as such. Consider Iowa. *E.g.*, *Iron Workers Loc. No. 67 v. Hart*, 191 N.W.2d 758, 767 (Iowa 1971) ("The right granted [to the] Commission to allow back pay . . . is only incidental to affirmative action equitably decreed and cannot by analogy generate a power to enter judgment for other common law damages."). Kansas. *E.g.*, *Woods v. Midwest Conveyor Co.*, 648 P.2d 234, 245 (Kan. 1982) (concluding authority to order "affirmative action" does not "permit[] orders . . . covering compensatory and punitive damages"). Maryland. *E.g.*, *Gutwein v. Easton Publ'g Co.*, 325 A.2d 740, 747 (Md. 1974) (explaining authority to order "affirmative action" does not "specifically authorize an award of compensatory damages"). Massachusetts.

*E.g.*, *Lab. Rels. Comm'n v. Bd. of Selectmen of Dracut*, 373 N.E.2d 1165, 1169 (Mass. 1978) ("[T]he statutory phrase 'further affirmative action' contemplates resort to the equitable powers . . . ."). New Hampshire. *E.g.*, *E.D. Swett, Inc. v. N.H. Comm'n for Hum. Rts.*, 470 A.2d 921, 927 (N.H. 1983) (declining to read "affirmative action" in state law "so as to encompass other forms of relief such as compensatory damages"). Ohio. *E.g.*, *Ohio C.R. Comm'n v. Lysyj*, 313 N.E.2d 3, 7 (Ohio 1974) (per curiam) (stating authority over "affirmative action" does not include "power to award either compensatory or punitive damages"). Pennsylvania. *E.g.*, *Pa. Hum. Rels. Comm'n v. Zamantakis*, 387 A.2d 70, 72–73 (Pa. 1978) (refusing to extend "authority by judicial fiat" over damages in state law permitting "affirmative action" because "[t]raditionally, damages, . . . have been a matter for courts of law" (citation modified). And the District of Columbia, to boot. *E.g.*, *Mendota Apartments v. D.C. Comm'n of Hum. Rts.*, 315 A.2d 832, 836 (D.C. 1974) (opining "the authority to order a respondent to 'take such affirmative action . . .' did not include the authority to award civil damages").

Federal courts, of course, have an independent duty to interpret federal statutes irrespective of how state courts might interpret parallel state statutes. *See, e.g.*, *Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 286 (1970). But we would be remiss to ignore the reality that state legislators and jurists—public officials trained in the law and operation of remedies—have long understood "affirmative action" in a specialized sense, referring only to equitable remedies. *See Bostock v. Clayton County*, 140 S. Ct. 1731, 1831–32 (2020) (Kavanaugh, J., dissenting) (consulting parallel state laws to support reading of federal statute). We see no reason to believe (and the Board has not given us one) that the 1935 Congress—composed of public officials similarly trained in the law and operation of remedies—understood the phrase differently.

5. This understanding also avoids an interpretation of § 10(c) that runs headlong into a basic protection in the Bill of Rights. Our longstanding approach is to interpret statutes in a way that avoids raising constitutional tension. *See, e.g.*, *Stern v. Marshall*, 564 U.S. 462, 477 (2011). In particular, "[w]hen the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be

avoided." *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 348 (1936) (Brandeis, J., concurring). That command bears emphasis here, as reading § 10(c) to authorize the Board to award compensatory damages as part of an administrative proceeding, as the Board urges, raises a constitutional question over a fundamental right ratified in the Seventh Amendment: that "[i]n Suits at common law, . . . the right of trial by jury shall be preserved . . . ." U.S. CONST. amend. VII; *see also Perttu v. Richards*, 145 S. Ct. 1793, 1800 (2025) ("Before inquiring into the applicability of the Seventh Amendment, we must first ascertain whether a construction of the statute is fairly possible by which the constitutional question may be avoided." (citation modified)).

Instructive on the scope of the jury trial right is the recent decision in *SEC v. Jarkesy*, 144 S. Ct. 2117 (2024). There, the Supreme Court reaffirmed that the Seventh Amendment encompasses all claims that are "legal in nature," regardless of whether they derive from statute or common law. *Id.* at 2128 (quoting *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 53 (1989)). At issue in *Jarkesy* was the SEC's practice of levying civil penalties in securities fraud adjudications through in-house proceedings, rather than seeking such awards in federal court. *Id.* at 2124–26. The Supreme Court deemed this practice inconsistent with the Seventh Amendment. *Id.* at 2139. Aside from a narrow category of "public rights" cases that have historically been handled by the political branches, *Jarkesy* explained, the Seventh Amendment guarantees the right to a jury trial whenever an agency seeks civil penalties or pursues common law actions. *Id.* at 2132, 2139. This guarantee was especially true, the Supreme Court emphasized, as to awards of "money damages," which represent "the prototypical common law remedy." *Id.* at 2129; *see* U.S. CONST. amend. VII ("In suits *at common law*, . . . the right of trial by jury shall be preserved[] . . . ."" (emphasis added)).

To be sure, nothing in *Jarkesy* displaced an administrative agency's ability to impose equitable remedies, consistent with their statutory authority. *Jarkesy*, 144 S. Ct. at 2128 ("The [Seventh] Amendment therefore 'embrace[s] all suits which are not of equity or admiralty jurisdiction[] . . . ." (second alteration in original) (quoting *Parsons v. Bedford, Breedlove & Robeson*, 28 U.S. (3 Pet.) 433, 447 (1830))). And "monetary relief," of course, "can be legal or equitable" in nature. *Id.* at 2129. But "monetary remed[ies]" qualify as "legal," and thus deserve

the right to resolution before a jury, if they are "designed to punish or deter the wrongdoer" rather than "solely to 'restore the status quo.'" *Id.* (quoting *Tull v. United States*, 481 U.S. 412, 422 (1987)).

Back to today's case, the remedy the Board imposed reflects legal relief amounting to money damages, to which a jury trial right attaches. "[A]ny other direct or foreseeable pecuniary harm incurred," how the Board formulated its award here, strikes us as merely a verbose way of referring to consequential damages—a "classic form of *legal* relief." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255 (1993) (citations omitted). And with it, it follows, the defendant's right to have a jury decide the Board's claims. In the *Thryv* case, the Fifth Circuit saw this as we do and deemed it "a novel, consequential-damages-like labor law remedy," and "draconian" to boot. *Thryv, Inc. v. NLRB*, 102 F.4th 727, 733, 737 (5th Cir. 2024); *see also id.* at 737–48 (concluding substantial evidence did not support the Board's factfinding, eliminating need to analyze the lawfulness of the Board's new remedy). That this remedy derives from statute (the NLRA) makes no difference. The Supreme Court has repeatedly reaffirmed the Seventh Amendment's applicability to statutory relief when legal in nature. *See, e.g.*, *Jarkesy*, 144 S. Ct. at 2128; *Granfinanciera*, 492 U.S. at 53; *Tull*, 481 U.S. at 417.

We do not doubt the Board's authority to tailor monetary payments so that they serve solely "to restore the status quo," rendering them equitable. *Tull*, 481 U.S. at 422. But awards under *Thryv* reach much farther than just that narrow category. In effect, they broaden the realm of § 10(c) relief to harms bearing, at best, a tangential relation to the respective unfair labor practice. *See Thryv*, 372 NLRB No. 22, slip op. at 9. The policymaking rationale for such remedies reflects the very crux of their unlawfulness: The Board is measuring monetary relief from the standpoint of the employee's loss, indicating its compensatory nature, rather than the employer's gain, which invokes equitable considerations. *Id.* ("'Make-whole relief' is more fully realized when it consistently compensates affected employees for all direct or foreseeable pecuniary harms that result . . . ."). In so doing, the Board has impermissibly shifted from equity to law. Whereas "[d]amages always begin[] with the aim of compensation for the plaintiff," "[r]estitution, in contrast, begins with the aim of preventing unjust enrichment of the defendant."

1 Dan B. Dobbs, *Law of Remedies* § 3.1, at 280 (2d ed. 1993); *see also Int'l Union of Operating Eng'rs*, 2025 WL 2963359, at *26 (Bumatay, J., dissenting in part).

Put another way, while *Thryv* awards may help restore the status quo, they are also intended to punish wrongdoers and deter future misconduct. Dobbs, *supra*, at 282 ("Even if the defendant is not subject to punitive damages, an ordinary 'compensatory' damages judgment can provide an appropriate incentive to meet the appropriate standard of behavior."). Just ask the Board. It characterizes the "design[]" of its awards as "advanc[ing] broader governmental policies," such as the "prohibition[] of antiunion discrimination[] and interference with employees' concerted activities for mutual aid or protection." NLRB Br. 54. Yet achieving these aims would require the Board to punish employers acting unlawfully, landing its proceedings squarely within Seventh Amendment territory.

To the same end, when justifying its widespread reliance on *Thryv* in all cases, the Board explained that its orders "run the risk of becoming punitive rather than restorative" if applied "only to address the most deplorable or flagrant violations," thereby justifying wholesale deployment. *Thryv*, 372 NLRB No. 22, slip op. at 11. More tailored enforcement of the Act, in other words, would too obviously reveal the punitive aspect of a *Thryv* remedy. But doing so on a more fulsome basis hardly changes their remedy's nature. As Judge Bumatay aptly explained, "a punitive measure is still punitive even if it applies across the board." *Int'l Union of Operating Eng'rs*, 2025 WL 2963359, at *6 (Bumatay, J., dissenting in part). In the context of § 10(c), then, awarding "all direct or foreseeable pecuniary harm" at least partly serves to punish and deter. The potential conflict between that purpose and the Seventh Amendment's strictures, especially as colored by recent Supreme Court precedent, further confirms why § 10(c) must be read to authorize equitable relief only.

D. The Board presses its reading of § 10(c) both on textual and precedential grounds.

1. Start with the text. According to the Board, § 10(c) is not limited merely to backpay and reinstatement; rather, Congress purportedly sought to vest the Board with vast remedial authority, including the capacious type of relief at issue here, so long as its award "effectuate[s] the policies of the [NLRA]." NLRB Br. 40 (citation modified). True, as the Board emphasizes,

§ 10(c)'s remedial powers are not confined solely to reinstatement with backpay. *See Fed. Land Bank v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941) ("[T]he term 'including' is not one of all-embracing definition, but connotes simply an illustrative application of the general principle." (citation omitted)). No one disputes that point. Rather, Starbucks asks us to read § 10(c) as cabining the Board's remedial authority to equitable relief, which includes (but is not limited to) reinstatement with or without backpay. *See, e.g.*, Starbucks Br. 38 (explaining "[t]h[e] language [of § 10(c)] authorizes only equitable relief" without any other restriction). In that sense, the Board still enjoys discretion to "effectuate the policies of" the NLRA, 29 U.S.C. § 160(c), so long as its ordered remedy sits within the broader realm of equitable relief. That the Board may seek to "effectuate the policies of th[e] [NLRA]" does not change our conclusion. In effect, this clause merely qualifies the meaning of the antecedent phrase "affirmative action," which, as already explained, encompasses only equitable remedies. *See, e.g.*, *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1170 (2021); *Fisher v. United States*, 144 S. Ct. 2176, 2183–84 (2024).

The Board denies any application of Title VII. In the Board's view, § 706(g), if it has any bearing here, in fact cuts against Starbucks's position given the statute's express reference to "any other equitable relief," 42 U.S.C. § 2000e-5(g)(1), a phrase missing from § 10(c). Two acknowledgements bear mentioning. One, we agree with the Board that courts should exercise caution when consulting analogous laws to glean statutory meaning. But doing so often proves useful. *See United States v. Davis*, 139 S. Ct. 2319, 2329 (2019) ("[W]e normally presume that the same language in related statutes carries a consistent meaning."). Two, we likewise recognize that § 10(c) does not explicitly mention equity, unlike Title VII. *Compare* 29 U.S.C. § 160(c), *with* 42 U.S.C. § 2000e-5(g)(1). That observation, however, misses the point. The latter's reference to "or any other equitable relief" suggests Congress, at least elsewhere in time, thought that "affirmative action" encompassed only equity. And because Congress "generally uses a particular word with a consistent meaning in a given context[,] . . . a later act can be regarded as a legislative interpretation of an earlier act in the sense that it aids in ascertaining the meaning of the words as used in their contemporary setting." *Erlenbaugh v. United States*, 409 U.S. 239, 243–44 (1972) (citation modified). Could the meaning of "affirmative action" have changed between 1935, the year of the NLRA's enactment, and 1972, the year of Title VII's at-issue amendment? In theory, yes. But in practice, the Board provides no evidence of such a

dramatic semantic shift, nor have we discovered anything suggesting as much. *See* Henry Campbell Black, *Handbook on the Construction and Interpretation of Laws* § 104, at 338 (2d ed. 1911) (noting that related statutes aid statutory interpretation "no matter whether they were enacted by the same legislature or at widely different times").

Continuing, the Board deems "unprecedented" any reading of an equity limit in the NLRA, given both § 10(c)'s failure to mention equity as well as the purportedly "archaic," "unworkable," and "obsolete" distinction between law and equity more broadly. NLRB Br. 50 (citations omitted). The Third and Fifth Circuits' holding on this issue, of course, makes our conclusion far from unprecedented. *See Starbucks Corp.*, 125 F.4th at 95; *Hiran Mgmt.*, 2025 WL 3041862, at *6. So too does the historical research above, which reflects that an equity limit is common in remedial statutes bearing near-identical structures to § 10(c). Nor can we, as jurists, codify any frustration with the line between law and equity, a job assigned solely to legislators. While that line sometimes wants for clarity, *see, e.g.*, *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 284 (1988), we may not transgress it merely for the sake of administrability, *see Great-W. Life & Annuity Ins. v. Knudson*, 534 U.S. 204, 216–17 (2002) ("It is easy to disparage the law-equity dichotomy as 'an ancient classification' and an 'obsolete distinctio[n].' Like it or not, however, that classification and distinction has been specified by the statute[] . . . ." (citations omitted) (first alteration in original)). Rather, our task, in these circumstances, is simply to assess the nature of a given remedy. And, on that score, even if we accepted the Board's reading of § 10(c) as a matter of statutory interpretation, we would still need to review the statute's compliance with the Seventh Amendment and, in so doing, glean whether the chosen remedy is legal or equitable. *See Jarkesy*, 144 S. Ct. at 2128.

Perhaps most telling, the Board fails to provide any alternative definition of the phrase "affirmative action." Aside from urging that this phrase accommodates its award here, the Board leaves us to guess where, if at all, its remedial authority ends. There is no need to guess. The plain, obvious, and most reasonable understanding, along with every applicable tool of statutory construction all point in one direction: § 10(c) permits only equitable relief. Could Congress have left even less doubt over the matter by adding the phrase "or other equitable relief" to § 10(c), as it later did in § 706(g)? Sure. But that mild imperfection does not undermine

Congress's other clear signals, chief among them, again, its use of the term of art "affirmative action." In practice, "Congress cannot" be expected to "anticipate (much less account for) every future statutory skirmish—and even if it could, courts have no authority to hold Congress to a 'perfect as we see it' standard of drafting." *Esteras v. United States*, 145 S. Ct. 2031, 2042 (2025) ("[W]e have routinely construed statutes to have a particular meaning even when Congress could have expressed itself more clearly." (citation modified)).

Even more revealing is the dissenting opinion, which barely engages with § 10(c)'s text. Save for a few prefatory references to the statutory term "affirmative action," the dissenting opinion ignores the phrase altogether, embracing in its place New Deal-era jurisprudence. Cases offering generic propositions about the Board's power, however, do not move the needle. *See* Dissenting Op. 39–40 (citing *Va. Elec. & Power Co. v. NLRB*, 319 U.S. 533, 540 (1943) (recognizing the Board's ability to "effectuate the policies of the Act")).

2. Turn next to case law. The Board cites an array of decisions, from the Supreme Court's to its own, allegedly demonstrating the Board's "broad remedial discretion to order make-whole relief." NLRB Br. 40. These cases, the Board says, exemplify its authority to freely order consequential damages to effectuate the expansive power that Congress intentionally bestowed upon it through § 10(c). We read this precedent differently.

At the outset, the Board obliquely suggests that we may examine its remedies only for an abuse of discretion, gleaning this practice from opinions describing the Board's power to remedy unfair labor practices as "a broad discretionary one, subject to limited judicial review." *Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 216 (1964) (citation omitted). The Board stretches that guidance too far. When acting *within* the boundaries of its statutory authority in § 10(c), we acknowledge, the Board enjoys discretion to craft remedies without substantial judicial interference. For example, we often defer to the Board's decision whether to grant reinstatement, a form of relief expressly permitted under § 10(c). *See, e.g., Compuware Corp. v. NLRB*, 134 F.3d 1285, 1291 (6th Cir. 1998) ("[T]he Board's decision that [the employee] should be reinstated is not an abuse of discretion as it is the normal remedy in an unlawful discharge case."). Yet here, on the other hand, the Board asks us to defer to its purported discretion to *set* the boundaries of § 10(c), a proposed novel extension of our past

practice. That we cannot do. As we recently explained, "[w]e do not defer to the NLRB's interpretation of the NLRA, but exercise independent judgment in deciding whether an agency acted within its statutory authority." *Rieth-Riley Constr.*, 114 F.4th at 528 (citing *Loper Bright*, 144 S. Ct. at 2262). Of the sister circuits that have addressed this issue, virtually all do likewise. *See, e.g.*, *Garten Trucking LC v. NLRB*, 139 F.4th 269, 276 (4th Cir. 2025); *United Nat. Foods, Inc. v. NLRB*, 138 F.4th 937, 946 (5th Cir. 2025); *3484*, 137 F.4th at 1104.

Nor do we share the Board's view that Congress has bestowed on it the power to order any form of "make-whole relief." That desire, if it ever existed, never manifested itself in the statute's text. "[A]ffirmative action" accommodates some forms of relief—such as reinstatement—while foreclosing others—such as consequential damages. Again, we emphasize the long-held understanding that "§ 10(c) is merely incidental to the primary purpose of Congress to stop and to prevent unfair labor practices. Congress did not establish a general scheme authorizing the Board to award full compensatory damages for injuries caused by wrongful conduct." *Russell*, 356 U.S. at 643. Holding otherwise would both contravene Supreme Court precedent and elevate generalized, out-of-context snippets from precedent over the law Congress enacted. *See Off. of U.S. Tr. v. John Q. Hammons Fall 2006, LLC*, 144 S. Ct. 1588, 1607 (2024) (Gorsuch, J., dissenting) ("[C]ourts may not elevate judicial guesswork about 'Congress's hypothetical intent' over 'statutory text,' which is the 'definitive expression of Congress's will.'" (citation omitted)).

What is more, the Board's reading understands Congress to have authorized the Board to undertake difficult consequential damages assessments during after-the-fact compliance proceedings. *See Thryv, Inc.*, 372 NLRB No. 22, slip op. at 19. To be sure, Congress authorized such proceedings in equitable remedial circumstances. *Id.* Yet unlike a proceeding dedicated to the more straightforward calculation of backpay, doing the same for "make-whole relief," as the Board envisions, seemingly would result in complicated, "protracted litigation" over "employees' personal financial circumstances" as well as the extent to which "the employee's own financial decisions contributed to the losses." *Id.* at 25 (members Kaplan & Ring, concurring in part and dissenting in part). And with the relevant evidence likely in the employee's possession alone, the Board's approach opens the door to speculative assessments

and harsh results. *See id.* at 27 (highlighting a $13.3 million initial assessment of consequential damages later reassessed at $435,000). The Board offers no reason to believe Congress licensed such an elaborate and unpredictable remedial scheme.

Undeterred, both the Board and the dissenting opinion cite a handful of the Board's own cases ordering relatively expansive forms of relief. But a smattering of cases decided over a ninety-year period says very little about the Board's common practice. *See, e.g.*, *United States v. Iselin*, 270 U.S. 245, 251 (1926) (declining to codify prior administrative rulings into statute because the agency's "construction was neither uniform, general, nor long-continued"). Equally true, while it comes as no surprise that the Board would take a maximal view of its own power, in the end, its interpretation of the NLRA is entirely beside the point. *See Hi-Craft Clothing Co. v. NLRB*, 660 F.2d 910, 916 (3d Cir. 1981) ("[G]overnment agencies have a tendency to swell, not shrink, and are likely to have an expansive view of their mission."). Remember, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Loper Bright*, 144 S. Ct. at 2273.

Nor, in any event, do these orders support *Thryv*'s all-encompassing award for "direct or foreseeable pecuniary harms." Fairly understood, they encompass "discrete losses related to an employee's lost wages or benefits that were unlawfully withheld," rendering them an arguable derivative of backpay. *3484*, 137 F.4th at 1124 (Eid, J., concurring in part and dissenting in part); *see, e.g.*, *Lou's Transp., Inc.*, 366 NLRB No. 140, slip op. at 1, 2018 WL 3570875 (July 24, 2018) (compensation for 401(k) growth otherwise unrealized after employer unlawfully ended retirement fund contributions); *Thryv*, 372 NLRB No. 22, slip op. at 7–8 (collecting cases). Far from justifying the Board's authority to issue sweeping damages remedies, in other words, these cases at most reflect instances of the Board's ordering monetary relief for losses directly caused by the employer's unfair labor practice. *See Thryv*, 372 NLRB No. 22, slip op. at 18 (members Kaplan & Ring, concurring in part and dissenting in part).

To the extent those past awards themselves comport with the equitable limit in § 10(c), they still fail to justify the capacious and novel relief sought here. Recall, by awarding "all direct or foreseeable pecuniary harms," the Board orders employers to reimburse a vast realm of tangentially related injuries. *Id.* at 9 (majority opinion). Childcare costs, credit card interest, and

penalties on early retirement-savings withdrawals merely scratch the surface of compensable harms. *Voorhees Care*, 371 NLRB No. 22, slip op. at 4 n.14. And the Board now desires to categorically order this capacious relief for every identified unfair labor practice—individual employee and employer circumstances notwithstanding. *Airgas USA*, 373 NLRB No. 102, slip op. at 1 n.1. Such an all-encompassing and generalized remedy constitutes a Carl Lewis–sized leap from the Board's practices of old. *See Int'l Union of Operating Eng'rs*, 2025 WL 2963359, at *19 (Bumatay, J., dissenting in part) ("Until two years ago, the Board had never claimed the authority to award consequential damages[] . . . ."); *West Virginia v. EPA*, 142 S. Ct. 2587, 2610 (2022) (expressing skepticism over an agency's "claim[ing] to discover in a long-extant statute an unheralded power" (citation modified)).

Taking a different tack, the Board posits that Starbucks has entirely mischaracterized its remedy. Both here and in *Thryv*, the Board says, it has carefully avoided describing its "make-whole order" as an award of consequential or compensatory damages. Rather, because those damages refer to "legal term[s] of art more suited for the common law of torts and contracts," the Board maintains that the phrase "all direct or foreseeable pecuniary harms" permissibly refers to "the make-whole principles of [§] 10(c)." *Thryv*, 372 NLRB No. 22, slip op. at 9. Yet that purported distinction makes little difference. The Board seeks to grant money damages for direct and foreseeable pecuniary harm, the exact type of recovery granted through compensatory and consequential damages in tort and contract law. *E.g.*, *Palsgraf v. Long Is. R.R. Co.*, 162 N.E. 99, 104–05 (N.Y. 1928); *Hadley v. Baxendale*, 9 Ex. 341, 156 Eng. Rep. 145, 151 (1854); *see also 3484*, 137 F.4th at 1125 (Eid, J., concurring in part and dissenting in part) (referring to *Thryv*'s example remedies as "something out of a torts treatise"). Indeed, at one juncture in *Thryv*, the Board expressly acknowledged that it was considering whether to "modify" awards so that they included "consequential damages," revealing both the novel and legal nature of these remedies. *Thryv*, 372 NLRB No. 22, slip op. at 6 n.8 ("[T]he Board invited all interested parties to file briefs regarding whether the Board should 'modify its traditional make-whole remedy in all pending and future cases to include relief for consequential damages, where these damages are a direct and foreseeable result of a respondent's unfair labor practice.'"). In any event, the Board seeks to grant monetary remedies at least partly designed to punish or deter employers acting unlawfully. That is the very definition of legal relief. *See Jarkesy*, 144 S. Ct. at 2129. We

cannot stake this case on semantic nuances as trivial as the remedy's purported label, especially a label chosen by the Board itself.

3. Lastly, both the Board and the dissenting opinion resist the applicability of constitutional avoidance principles. Beginning with the dissenting opinion, it proceeds from a flawed understanding of *Jarkesy*. The dissenting opinion reads the decision to mean that any remedy that "seeks solely to restore the status quo," such as the Board's make-whole relief, is "equitable" in nature. Dissenting Op. 43 (citing *Jarkesy*, 144 S. Ct. at 2129). That sweeping interpretation is difficult to accept. Recall that the issue in *Jarkesy* was whether the Securities and Exchange Commission could impose civil sanctions through agency proceedings when confronted with a regulated party's request for a jury trial, in line with the Seventh Amendment. 144 S. Ct. at 2127–29. In deeming a civil sanction remedy "legal," meaning Jarkesy could demand that the matter be resolved by a jury rather than the agency alone, the Supreme Court emphasized the fact that a sanction does not serve to compensate the injured party but instead functions to "punish or deter the wrongdoer," making it a remedy at law. *Id.* at 2129. That reality, however, is merely one aspect of the law-equity distinction. It bears repeating that even relief that goes to the victim—including compensatory damages—may be legal in nature if measured by the victim's loss rather than the wrongdoer's gain. *See City of Monterey v. Del Monte Dunes at Monterey*, 526 U.S. 687, 710–11 (1999); *Int'l Union of Operating Eng'rs*, 2025 WL 2963359, at *25–26 (Bumatay, J., dissenting in part). Punitive remedies, in other words, are merely a subset of the broader range of legal remedies.

Conflating legal and punitive remedies as one and the same, as the dissenting opinion appears to do, has little grounding in law. *See* Dissenting Op. 44 (quoting *Jarkesy*, 144 S. Ct. at 2130) ("[I]f a remedy is 'designed to punish and deter, not to *compensate*' then it is 'legal in nature.'"). Take Title VII, for instance. We have routinely allowed Title VII plaintiffs to seek "compensatory or punitive damages" before a jury. *See Craddock v. FedEx Corp. Servs., Inc.*, 102 F.4th 832, 841 (6th Cir. 2024) (citing *Del Monte Dunes*, 526 U.S. at 710–11) (noting that "compensatory relief constitutes legal relief under the Seventh Amendment"). Yet from the dissenting opinion's point of view, a Title VII plaintiff who seeks only compensatory damages has no right to a jury trial. If that were the case, the consequences would be dramatic, not only

for Title VII plaintiffs, but for many other plaintiffs too. In practice, the dissenting opinion's approach would effectively repeal the Seventh Amendment for a breathtaking range of traditionally legal claims. Not surprisingly, no other court, to our knowledge, has embraced this novel reading of *Jarkesy*, a decision widely understood as *reinforcing* the jury trial right. *See Jarkesy*, 144 S. Ct. at 2140 (Gorsuch, J., concurring) (understanding "the Court's course" in *Jarkesy* to help "vindicate the Constitution's promise of a 'fair trial in a fair tribunal'").

The Board, meanwhile, points to a handful of Supreme Court cases invoking the "public rights" exception. The public rights doctrine has sharp limits. It extends "only to matters arising between individuals and the Government in connection with the performance of constitutional functions of the executive or legislative departments that historically could have been determined exclusively by those branches." *Stern*, 564 U.S. at 485 (citation modified); *see also Jarkesy*, 144 S. Ct. at 2146 (Gorsuch, J., concurring) ("[P]ublic rights are a narrow class defined and limited by history[,] . . . traditionally includ[ing] the collection of revenue, customs enforcement, immigration, and the grant of public benefits."). In those unique settings, Congress may assign certain matters to agencies for adjudication even though such proceedings would not afford the right to a jury trial. *Jarkesy*, 144 S. Ct. at 2132. According to the Board, because its proceedings are "purely statutory creations designed to advance broader governmental policies," we should deem them "quintessential public rights" and, in so doing, interpret § 10(c) free from any concern that the Board's reading of the statute raises Seventh Amendment implications. NLRB Br. 54.

We decline the invitation. At the outset, "[e]ven with respect to matters that arguably fall within the scope of the 'public rights' doctrine, the presumption is in favor of Article III courts." *Jarkesy*, 144 S. Ct. at 2134 (citation omitted). And as to the Seventh Amendment in particular, it applies equally to congressionally established rights. *See, e.g., id.* at 2134–35; *Granfinanciera*, 492 U.S. at 53; *Tull*, 481 U.S. at 417. So instead of asking only whether an asserted right derives from common law or Congress, courts must also examine the given proceeding's "nature" to determine whether an agency is impermissibly adjudicating private rights. *Jarkesy*, 144 S. Ct. at 2134 (citation omitted). That well describes the case here, where the Board seems to award consequential damages for every instance of an unfair labor practice. *Airgas USA*, 373 NLRB

No. 102, slip op. at 1 n.1. That manner of relief, of course, "possess[es] a long line of common-law forebears," for which Congress cannot "conjure away the Seventh Amendment" by simply "assigning" adjudicative proceedings to an agency. *Granfinanciera*, 492 U.S. at 52. It also "goes beyond defending the public interest in federal labor policy and instead targets 'the wrong done the individual employee,'" transcending the Board's permissible considerations when fashioning unfair labor practice remedies. *Int'l Union of Operating Eng'rs*, 2025 WL 2963359, at *27 (Bumatay, J., dissenting in part) (quoting *Vaca v. Sipes*, 386 U.S. 171, 182 n.8 (1967)). It is thus no surprise that the Board fails to cite an "unbroken tradition" or "historic categor[y]" of nonjudicial adjudication over *Thryv*-like awards. *Jarkesy*, 144 S. Ct. at 2122–23; *see also id.* at 2147 (Gorsuch, J., concurring) ("[W]e look for some 'deeply rooted' tradition of nonjudicial adjudication before permitting a case to be tried in a different forum under different procedures." (citation omitted)). Nor could it. As already explained, *Thryv* stands as a novel and expansive application of the ninety-year-old NLRA.

Neither *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1 (1937), nor *Atlas Roofing Co. v. Occupational Safety & Health Review Commission*, 430 U.S. 442 (1977), changes our thinking. The former expressly limited itself to the then-"instant case" of reinstatement with backpay, *Jones & Laughlin*, 301 U.S. at 22, 48, whereas the latter controls only for claims "unknown to the common law," *Jarkesy*, 144 S. Ct. at 2138 (quoting *Atlas Roofing*, 430 U.S. at 461); *see also id.* at 2149–50 (Gorsuch, J., concurring) (criticizing *Atlas Roofing* at length); *id.* at 2138 n.4 (majority opinion) ("As the concurrence shows, *Atlas Roofing* represents a departure from our legal traditions."). As explained, the public-rights determination looks to more than just the origin of an asserted right. Instead, we must examine the type of relief at issue when evaluating the Seventh Amendment's applicability. *See id.* at 2129 (observing that the remedy is "more important" (citation omitted)). And just as some forms of relief (those in equity) may avoid a jury trial, others (those at law) cannot, even when they concern the same agency and the same statute. Accordingly, although *Jarkesy* preserved the narrow holdings of both *Atlas Roofing* and *Jones & Laughlin*, those cases bear no relevance when, as here, an agency seeks to award quintessentially legal relief with common law roots. As explained, the Board's efforts both lack statutory authority and raise serious constitutional questions.

* * * * *

We grant the Board's petition for enforcement as to its factfinding but vacate its award and remand for proceedings consistent with this opinion.

---

**CONCURRENCE / DISSENT**

---

JANE B. STRANCH, Circuit Judge, concurring in the judgment in part, and dissenting in part. I concur in the judgment with respect to Part I and II, as they lead to the correct holding that substantial evidence on the record supported the Board's factual conclusion that anti-union animus motivated Starbucks's discharge of Whitbeck and thus constituted an unfair labor practice in violation of the NLRA. I dissent with respect to Part III. I would instead affirm the Board's explanation of the damages award and hold that it acted within its discretion by ordering Starbucks to make Whitbeck whole for all direct or foreseeable pecuniary harms suffered because of its unfair labor practice.

## I. ANALYSIS

### A. Part II—Substantial Evidence of Anti-Union Animus

Although I agree with the majority opinion's finding of substantial evidence, I pause to more clearly articulate the governing legal standard under *Wright Line's* burden-shifting framework. 251 NLRB 1083 (1980), *enforced*, 662 F.2d 899 (1st Cir. 1981), *cert. denied*, 455 U.S. 989 (1982), *abrogated on other grounds by, N.L.R.B. v. Transp. Mgmt. Corp.*, 462 U.S. 393 (1983).

The place to begin is with the findings, purposes, and text as stated by Congress at the time it enacted the NLRA. Congress declared that the policy of the United States is to eliminate substantial obstructions to the free flow of commerce by "encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection." 29 U.S.C. § 151. To fulfill its purpose, the NLRA guarantees employees the right "to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."

29 U.S.C. § 157. Congress "ensur[ed] robust protection of these rights," *Charter Commc'ns, Inc. v. NLRB*, 939 F.3d 798, 808–09 (6th Cir. 2019), by including provisions in the NLRA that forbid employers from: discriminating in hiring to encourage or discourage membership in any labor organization, 29 U.S.C. § 158(a)(3); interfering, restraining, or coercing employees in exercising their rights under the NLRA, *id.* § 158(a)(1); and discriminating against employees because they have filed charges or given testimony in NLRA proceedings, *id.* § 158(a)(4). All three statutory protections are implicated by Starbucks's actions.

The Supreme Court in *NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 403–04 (1983) adopted the Board's burden-shifting framework as articulated in *Wright Line* for reviewing a discriminatory discharge claim. *See Charter Commc'ns*, 939 F.3d at 815 (recognizing the Supreme Court's adoption of *Wright Line*). Applying that framework here, the majority opinion correctly states that the General Counsel had to show by a preponderance of the evidence that Starbucks fired Whitbeck on the basis of anti-union animus. *See id.* It is undisputed that "if the employer fires an employee for having engaged in union activities and has no other basis for the discharge, or if the reasons that he proffers are pretextual," the employer has committed an unfair labor practice. *Transp. Mgmt.*, 462 U.S. at 398.

A showing that anti-union animus motivated the employee's discharge may be "inferred from circumstantial as well as direct evidence." *Airgas USA, LLC v. NLRB*, 916 F.3d 555, 561 (6th Cir. 2019) (quoting *W.F. Bolin Co. v. NLRB*, 70 F.3d 863, 871 (6th Cir. 1995)). Purely circumstantial factors that support a finding of anti-union animus include

> the company's expressed hostility towards unionization combined with knowledge of the employees' union activities; inconsistencies between the proffered reason for [discipline] and other actions of the employer; disparate treatment of certain employees compared to other employees with similar work records or offenses; a company's deviation from past practices in implementing the [discipline]; and proximity in time between the employees' union activities and their [discipline].

*Id.* The Board can also look to an employer's conduct before and after the termination to determine the "true motivation" for the discharge. *NLRB v. Roemer Indus.*, 824 F. App'x 396, 404 (6th Cir. 2020) (collecting cases considering conduct before and after the termination).

The majority opinion recounts many of the record facts supporting several of these factors. Because the governing standard looks to substantial evidence, I pause to add only one piece of circumstantial evidence omitted by the majority opinion—Starbucks's deviation from its past investigation and disciplinary procedures when discharging Whitbeck. The Board noted flaws in Starbucks's investigation of Whitbeck's violation of the two-employee rule, centering primarily on its deviation from Starbucks's policy that considered mitigating factors in these investigations. Starbucks's corrective action policy states "the form of the corrective action taken will depend on the seriousness of the situation and the surrounding circumstances." And Schmehl testified that Starbucks was consistent in applying this policy. Notwithstanding Starbucks's policy of considering the circumstances underlying a supposed violation, no one asked Whitbeck why she left the store that night even though she stated in her incident report that it was because of "something serious."

A proper investigation would have shed light on several mitigating factors that should have been considered in the disciplinary decision making. For example, such an inquiry would have revealed the sensitive justification for Whitbeck's departure—that her grandfather had had a heart attack. Or, as the Administrative Law Judge noted, it would have revealed that Whitbeck's managers put her at risk of violating the two-employee rule because they scheduled B.G.'s meal break for a time frame that extended beyond the end of her shift. In sum, these mitigating factors would have (or should have) impacted the disciplinary measures taken by Starbucks. I now turn to my dissent to address the remedies available for employees harmed by their employer's unfair labor practices.

**B. Part III—The Board's Award of *Thryv* Damages**

Addressing the issue of damages requires a further dive into the history of the enactment of the NLRA.[1] The NLRA was borne out of economic strife that hindered the free flow of commerce and resulted in periods of unrest, instability, and crisis for Americans. *See* National Labor Relations Act, ch. 372, § 1, 49 Stat. 449, 449 (1935). Congress identified the reoccurring problem of labor disputes, at the heart of which was the inequitable bargaining power between

[1]Because I write to respond to the majority opinion's position on damages under the NLRA, I do not address the issue of Starbucks's forfeiture.

individual employees and their company employers. *Id.* Congress's chosen solution was to enact the NLRA to promote and protect collective bargaining through which employees could fairly negotiate their working conditions and livelihood. *Id.* To further this goal, the NLRA identifies specific unfair labor practices that are common harms perpetrated against employees to prevent unionization and collective bargaining. *See* 29 U.S.C. § 158. Unfair labor practices reflect anti-union animus and, if left unremedied, operate as silencing mechanisms that discourage future bargaining activities by the harmed employees as well as by the employees who witness the unchecked actions of their employer. The NLRA, therefore, created the National Labor Relations Board and authorized it to order the perpetrators of unfair labor practices to "take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this [Act]."[2] National Labor Relations Act, ch. 372, § 10(c), 49 Stat. 449, 454 (1935) (codified as amended at 29 U.S.C. § 160(c)).

The Supreme Court confirmed the plain meaning of the NLRA's text—that the Board has wide discretion to order affirmative action that effectuates the policies of the NLRA. *Virginia Elec. & Power Co. v. NLRB*, 319 U.S. 533, 539 (1943). And the Court further explained that the statute does not direct the Board to take affirmative action but empowers the Board to do so as will effectuate the policies of the act. *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 189 (1941). And in response to a historical debate long put to rest, the Supreme Court disavowed reading the plain text of § 10(c) to limit the Board's remedies, as the word "including" signals an example not a limitation. *See id.* As *Phelps* noted, limiting the statute by the word "including" would be "to shrivel a versatile principle to an illustrative application." *Id.*

Contemporaneous Supreme Court authority also made clear that because Congress could not "define the whole gamut of remedies to effectuate [the policies of the Act] in an infinite variety of specific situations," arguments limiting the Board's remedial power stand in direct contradiction to the intention of Congress—to defer to the Board's expertise in deciding the "particular means by which the effects of unfair labor practices are to be expunged." *Id.* at 194 (explaining that Congress did not limit the Board's remedial power); *Virginia Elec.*, 319 U.S. at 539–40 (emphasizing deference to the Board's remedial discretion). Giving the Board's

[2]Hereinafter referenced to as § 10(c).

remedial authority the "considerable weight" it is due, the Court held that the Board's fashioning of remedies "should stand unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *Virginia Elec.*, 319 U.S. at 540; *accord Lou's Transport, Inc. v. NLRB*, 945 F.3d 1012, 1018 (6th Cir. 2019).

Within this wide discretion, the Board has always awarded make-whole remedies to fully accomplish the policies of the NLRA. As the Supreme Court explained, "[m]aking the workers whole for losses suffered on account of an unfair labor practice is part of the vindication of the public policy which the Board enforces." *Phelps*, 313 U.S. at 197. And the NLRB has long made clear, "[f]rom the earliest days of the Act, a make-whole remedy for employees injured by unlawful conduct has been a fundamental element of the Board's remedial approach. . . . The Supreme Court has repeatedly underscored the essential role of make-whole relief in the statutory scheme." *Goya Foods of Florida and United Here, CLC*, 356 NLRB 1461, 1462 (2011). Such remedies rely on the Board's expertise in rectifying the identified unfair labor practices and "express an intuition of experience which outruns analysis and sums up many unnamed and tangled impressions." *NLRB v. Seven-Up Bottling Co. of Miami*, 344 U.S. 344, 348 (1953) (quoting *Chicago, Burlington & Quincy R. Co. v. Babcock*, 204 U.S. 585, 598 (1907)).

Traditionally, make-whole remedies have been understood as "a restoration of the situation, as nearly as possible, to that which would have obtained but for the illegal discrimination." *King Soopers, Inc. and Wendy Geaslin*, 364 NLRB 1153, 1155 (2016) (quoting *Phelps*, 313 U.S. at 194), *enforced in relevant part*, 859 F.3d 23, 37 (D.C. Cir. 2017). It is well recognized that harms to employees, such as the paradigmatic case of being fired for supporting unionization, can lead to significant downstream effects—from unpaid bills to the more current danger of loosing medical insurance.

That is why restorative make-whole remedies under the NLRA have routinely, with judicial approval, exceeded any claimed limitation to backpay and reinstatement only. The Board has noted the multiplicity of specific remedies granted to enable a complete remedy that makes the harmed employee whole. Examples of such remedies are interim employment

expenses, *Crossett Lumber Co.*, 8 NLRB 440, 497–98 (1938); search-for-work expenses, *King Soopers, Inc.*, 364 NLRB 1153 at 1156–60; compensation for investment growth not realized, *Lou's Transp., Inc. & T.K.M.S., Inc.*, 366 NLRB No. 140, 2018 WL 3570875 (July 24, 2018), *enforced*, 945 F.3d 1012 (6th Cir. 2019); legal fees to handbilling employees, *Baptist Mem'l Hosp.*, 229 NLRB 45, 46 (1977); reimbursement for damaged toolboxes, *Napleton Cadillac of Libertyville*, 367 NLRB No. 6, slip op. at 4, 2018 WL 4694098 (Sept. 28, 2018), *enforced per curiam*, 976 F.3d 30 (D.C. Cir. 2020); and monetary reimbursement for clothing ruined, *BRC Injected Rubber Prods., Inc.*, 311 NLRB 66, 66 n.3 (1993). The effect of these remedies is to retain the previously bargained for terms of employment and re-establish the bargaining power of the harmed employees and their chosen representatives, thereby restoring the status quo as if an unfair labor practice had never happened.

The Board's recent decision in *Thryv*, 372 NLRB No. 22, 2022 WL 17974951 (Dec. 13, 2022), is consistent with this long-standing precedent. The Board continued its practice of awarding make-whole remedies by expressly ordering respondents "to compensate affected employees for all direct or foreseeable pecuniary harms that these employees suffer as a result of the respondent's unfair labor practice." *Id.* at 1. This directive is consistent with what the Board has ordered in the past. For example, when an employer "terminated employees' health insurance without informing the union or its employees while continuing to deduct healthcare premiums," the Board held that it was "entirely foreseeable that the affected employees would incur out-of-pocket expenses in the interim." *Id.* at 20 (citing *Voorhees Care & Rehab. Ctr.*, 371 NLRB No. 22, slip op. at 3–4, 2021 WL 3812220 (Aug. 25, 2021)). The Board therefore ordered the employer to reimburse the employees for the costs they occurred, including: "increases in premiums, copays, coinsurance, deductibles, and other out-of-pocket expenses, as well as to pay any still-unpaid medical bills directly to the medical providers." *Id.* (citation modified). Or when an employer unlawfully reassigned a union activist to a job pulling nails that aggravated her carpal-tunnel syndrome and caused her other harm, the Board made the employee whole by reimbursing her for any medical expenses, plus interest, incurred "as a result of the unlawful reassignment." *Nortech Waste*, 336 NLRB 554, 556 (2001).

There are, of course, limits on remedies tied to the Act. The Supreme Court has held the Board to be outside its authority when it seeks to award remedies that are not "tailored to the unfair labor practice it is intended to redress." *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 900 (1984). The Court explained that the "remedy must be sufficiently tailored to expunge only the *actual*, and not merely *speculative*, consequences of the unfair labor practices." *Id.* at 900–01. The Board explained that *Thryv* damages are limited to "those which can fairly be said to effectuate the policies of the Act." 372 NLRB No. 22, slip op. at 10 (quoting *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 203 (1964) (quoting *Virginia Elec.*, 319 U.S. at 539 (citation modified))). This limitation assures that the NLRA's "statutory purpose" will be fulfilled by Board remedies that ensure employees are fully restored to the situation they would have inhabited but for a respondent's unfair labor practice. *Id.* at 15.

Without speaking to the broader debate regarding equitable versus legal limitations, *Thryv* expounds on the Board's power to grant equitable remedies; it does not purport to expand that power to legal remedies. The Supreme Court recently addressed the contours of equitable as opposed to legal claims based on the principle that the Seventh Amendment and the right to a jury trial is implicated when a claim is legal in nature. *SEC v. Jarkesy*, 603 U.S. 109, 123 (2024); (Maj. Op. at 23). And as the Seventh Amendment "embrace[s] all suits which are not of equity or admiralty jurisdiction," a claim held to be of equity does not implicate the Seventh Amendment. 603 U.S. at 122. Because some causes of action "sound in both law and equity," the Court explained, the remedy is the "more important" consideration in discerning between the two. *Id.* at 122–23.

It is important to note that *Jarkesy* arises in the different context of imposing civil penalties for violations of securities laws in administrative penalty proceedings, whereas this case concerns make-whole remedies. *Id.* at 118–19. *Jarkesy* teaches that although "monetary relief can be legal or equitable," the distinction depends on whether "it is designed to punish or deter the wrongdoer, or, on the other hand, solely to 'restore the status quo.'" *Id.* at 123 (quoting *Tull v. United States*, 481 U.S. 412, 422 (1987)). The Supreme Court explained that "only courts of law issued monetary penalties to 'punish culpable individuals,'" meaning that punitive remedies are one category of legal remedies. *Id.* A punitive remedy "cannot fairly be said solely

to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes." *Id.* (quoting *Austin v. United States*, 509 U.S. 602, 610 (1993)). An equitable remedy, however, seeks solely to restore the status quo. *Id.* I agree with the majority opinion that "[p]unitive remedies . . . are merely a subset of the broader range of legal remedies." (Maj. Op. at 32). But I do not agree with the majority opinion's mischaracterization of my position as contending that all legal remedies are punitive. (Maj. Op. at 32). Because I do not make that contention, the majority opinion's conclusions regarding that position and its impact on Title VII are simply inapposite.

Applying *Jarkesy* here starts with the Supreme Court's explanation of the Board's power. Soon after the enactment of the NLRA, the Supreme Court recognized the Board's power to be "remedial, not punitive," holding that Congress did not vest the Board with "punitive jurisdiction enabling the Board to inflict upon the employer any penalty it may choose." *Republic Steel Corp. v. NLRB*, 311 U.S. 7, 11–12 (1940) (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 235 (1938)). This limitation has been reflected routinely in Board orders. *See, e.g.*, *M & M Affordable Plumbing*, No. 13-CA-121459, 2018 WL 1255489, slip op. at 10 (N.L.R.B. Div. of Judges Mar. 9, 2018) ("The Board . . . is not prepared to deviate from its current remedial practice and will not order reimbursement of consequential damages."); *Cascades Containerboard Packaging*, 371 NLRB No. 25, slip op. at 6 n.9, 2021 WL 4078443 (Aug. 27, 2021) ("The imposition of a monetary remedy in addition to those necessary to make discriminatees whole would exceed the Board's remedial authority, as the Supreme Court has held.").

By indicating that the remedy in every case should address making the harmed employee whole, *Thryv* goes no further. Indeed, it acts as a guardrail that keeps the Board within the equitable boundaries from which the majority opinion claims it has strayed. Consider the way *Thryv* defines "direct and foreseeable"—direct harms are those "directly caused by the unfair labor practice," and foreseeable harms are those "foreseeable at the time of the unfair labor practice and . . . incurred as a result of the unfair labor practice." 372 NLRB No. 22, slip op. at 19. These definitions tie the remedies granted to the specific unfair labor practice committed and confines them to the scope of the Board's statutory authority to provide make-whole redress. It

further establishes procedural safeguards by requiring the General Counsel, in compliance proceedings, to provide evidence of "the amount of pecuniary harm, the direct or foreseeable nature of that harm, and why that harm is due to the respondent's unfair labor practice." *Id.* at 9. And it then gives the respondent a guaranteed opportunity to challenge the relief requested by arguing that it is not direct or foreseeable, or that it would have occurred regardless of the unfair labor practice. *Id.* Such safeguards ensure both that the Board does not exceed its equitable authority and trespass into legal remedies by imposing fines or sanctions, and that its remedies are applied consistently. These guardrails prevent the very "speculative assessments and harsh results" the majority opinion hypothesizes will occur. (Maj. Op. at 29–30).

The majority opinion challenges the historic caselaw and this text-based analysis by positing a policymaking rationale for *Thryv* damages and then declaring that rationale the "crux of their unlawfulness." (Maj. Op. at 24). It does so by faulting the Board as measuring monetary relief from "the standpoint of the employee's loss, indicating its compensatory nature, rather than the employer's gain, which invokes equitable considerations." (Maj. Op. at 24). But such assumption of what lies in equity ignores *Jarkesy*'s straightforward test—that if a remedy is "designed to punish and deter, not to *compensate*," 603 U.S. at 125 (emphasis added), then it is "legal in nature" and the Seventh Amendment attaches, *id.* at 122. The Supreme Court's test emphasized that because the SEC was "not obligated to return any money to victims," the civil penalties they sought were not, by definition, a remedy that restored the status quo and could "make no pretense of being equitable." *Id.* at 124. Unlike the SEC's remedy there, *Thryv* focuses solely on restoring the status quo by compensating employees for the harms caused by the unfair labor practice and reestablishing the employees' bargaining position with the employer, thereby reviving the employees' rights "to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157.

In sum, the Board's application of *Thryv* in ordering Starbucks to make Whitbeck whole for its unlawful discharge, including relief for direct or foreseeable pecuniary harms resulting from Starbucks's unfair labor practice, was well within the Board's discretion and statutory authority.

## II. CONCLUSION

Supreme Court precedent, history and tradition, and the plain text of the NLRA all lead to the conclusion that *Thryv* correctly relies upon decades of Supreme Court precedent, safeguards within the bounds of equity the actions of the Board, and fully effectuates the instructions of Congress in the NLRA. I therefore respectfully concur in the judgment as to Parts I and II of the majority opinion and dissent with respect to Part III.